**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| **ALLSTATE INSURANCE COMPANY, ALLSTATE FIRE AND CASUALTY INSURANCE COMPANY, ALLSTATE INDEMNITY COMPANY, AND ALLSTATE PROPERTY AND CASUALTY INSURANCE COMPANY**<br><br>Plaintiffs,<br><br>-against-<br><br>**SKILLMAN CHEMISTS CORP., VYACHESLAV KHAIMOV, JOHN DOES 1 THROUGH 5, AND ABC CORPORATIONS 1 THROUGH 5,**<br><br>Defendants. | **CIVIL ACTION**<br><br>**24-CV-6619**<br><br>**COMPLAINT**<br><br>**(JURY TRIAL DEMANDED)** |

Allstate Insurance Company, Allstate Fire and Casualty Insurance Company, Allstate Indemnity Company, and Allstate Property and Casualty Insurance Company (interchangeably referred to herein as "Plaintiffs" and "Allstate"), by their attorneys Manning & Kass, Ellrod, Ramirez, Trester LLP, for their Complaint against Defendants Vyacheslav Khaimov ("Khaimov") and Skillman Chemists Corp. d/b/a Sunnyside Pharmacy ("Skillman Chemists") (Khaimov and Skillman Chemists are collectively referred to as "Defendants"), John Does 1 through 5, and ABC Corporations 1 through 5 allege as follows:

## PRELIMINARY STATEMENT

1.       From at least 2021 and continuing through the filing of this Complaint, Defendants engaged in a massive scheme to defraud Plaintiffs, through the exploitation of New York's Comprehensive Motor Vehicle Insurance Reparations Act (popularly known as the "No-fault Law").

2.       Pursuant to the No-fault Law, policyholders and others who suffer injuries in automobile accidents ("Covered Persons") can obtain payments from the policyholders' automobile insurance companies, including Plaintiffs, for necessary medical care ordered by the Covered Persons' physicians or prescribing providers. Covered Persons are also permitted to

assign those benefits to doctors and other licensed healthcare providers, including pharmacies, enabling them to bill insurance companies directly for their services.

3.     This action seeks to recover more than $167,000.00 that Defendants stole from Plaintiffs, and other economic injuries suffered by Allstate which flowed directly from the submission of hundreds of false and/or fraudulent insurance claims, seeking reimbursement for specifically-targeted, medically unnecessary "pain relieving" pharmaceutical products, including topical pain creams, topical pain patches, and a limited variety of other oral medications, as well as durable medical equipment ("DME") and/or orthotic devices.  As used herein, (i) "DME" generally refers to equipment and/or supplies used for medical purposes by individuals in their homes, including, among other things, cervical pillows, cervical traction units, cold/hot water circulating pumps, EMS units, hot/cold packs, infrared heat lamps, lumbar cushions, mattresses; and (ii) "orthotic devices" generally refers to items that are used to support a weak or deformed body member or to restrict or eliminate movement for medical purposes.  Such items include, but are not limited to, back braces, cervical collars, knee braces, shoulder braces and wrist braces.

4.     As part of the schemes to defraud alleged herein, the Defendants entered into illegal kickback arrangements with No-fault clinics in the New York metropolitan area (the "Prescribing No-fault Clinics" or "No-fault Clinics") and unlicensed laypersons who work at or are associated with the No-fault Clinics ("Clinic Controllers") pursuant to which the No-fault Clinics and/or their associated healthcare professionals ("Health Care Practitioners" or "HCPs") prescribed expensive pharmaceuticals, DME and/or orthotic devices.

5.     In furtherance of Defendants' scheme to defraud, Covered Persons who were purportedly involved in automobile accidents would present to the Prescribing No-fault Clinics where they would, as a matter of pattern, practice and protocol, purportedly undergo an aggressive

pre-determined course of treatment, which included the prescription of certain medications specifically targeted for their high profit margins, including Topical Pain Creams, Topical Pain Patches  and/or a limited variety of other medications such as NSAIDs or muscle relaxers, irrespective of medical necessity, as well as DME and/or orthotic devices.

6.     Such pharmaceuticals fraudulently prescribed by the Prescribing No-Fault Clinics and/or HCPs included topical pain creams, gels, lotions and ointments dispensed and billed in exorbitant prices by Skillman Chemists, including, Lidocaine 5% ointment, and Diclofenac Sodium 3% gel (the "Topical Pain Creams"), as well as a select few oral medications, primarily in the form of a limited variety of nonsteroidal anti-inflammatory drugs ("NSAIDs"), such as Ibuprofen, Naproxen, and Celecoxib, and a limited variety of muscle relaxers, such as Baclofen, Cyclobenzaprine, and Tizanidine, and topical pain patches such as Lidothol or its generic equivalent, Lidocaine 4.5%-Menthol 5% transdermal patches ("Lidothol patches" or "Topical Pain Patches") (collectively "Fraudulent Pharmaceuticals").   Pursuant to the illegal kickback arrangements, these medications were routinely prescribed to Covered Persons, rather than commercially available and more affordable over-the-counter medications and pain creams that have been approved by the FDA. Skillman Chemists targeted the Topical Pain Creams, Topical Pain Patches, and other select oral medications rather than the cheaper over-the-counter alternatives for no other purpose than to submit fraudulent, inflated bills to Plaintiffs for reimbursement, exploiting the Covered Persons for financial gain, without regard to genuine patient care.

7.     The prescriptions for the Fraudulent Pharmaceuticals, which were issued by Prescribing No-fault Clinics and/or HCPs and sent to Skillman Chemists for dispensing and billing, were, at times, tailored to boilerplate, pre-printed examination reports designed to limit the

prescribing providers' prescriptions to a predetermined treatment protocol, and justify continued, voluminous and excessive use of prescribed pharmaceuticals, including the Topical Pain Creams, Topical Pain Patches and other select oral medications.

8.      To effectuate the scheme and maximize profits, the Defendants dispensed a handful of specific pain medications, including the Topical Pain Creams, Topical Pain Patches, and a select few oral NSAIDs and muscle relaxers, based solely on the medications' exorbitant pricing and high profit margins.  In exchange for kickbacks and financial incentives and pursuant to collusive, illegal arrangements, Defendants induced the Prescribing No-fault Clinics, Clinic Controllers and HCPs to prescribe these targeted, exorbitantly priced pain medications, including the Topical Pain Creams, Topical Pain Patches, and other select NSAIDs and muscles relaxers, without regard to genuine patient care, and directed large volumes of these prescriptions to Skillman Chemists.

9.      Once the Fraudulent Pharmaceuticals were prescribed, if they were dispensed at all, they were either given to Covered Persons directly at the Prescribing No-fault Clinics or mailed to the Covered Persons from Skillman Chemists.  Covered Persons were not given any choice as to where their prescriptions would be filled.

10.     When the Defendants purported to provide the Fraudulent Pharmaceuticals to Covered Persons covered by Plaintiffs, Skillman Chemists sought reimbursement directly from Plaintiffs pursuant to executed "Assignment of Benefit" ("AOB") forms and New York State Department of Insurance claim form ("NF-3"), often with additional forms listing each billed-for pharmaceutical by its national drug code ("NDC")[1] number.

---

[1] A National Drug Code ("NDC") number is a unique 10-digit code that identifies each prescription drug product (whether brand name or generic) by the drug itself, the vendor of the drug and the quantity in which the drug was packaged.

11.     The Defendants also never submitted wholesale purchase invoices to Plaintiffs demonstrating the NDC number for the pharmaceuticals Skillman Chemists obtained and how much Skillman Chemists actually paid the suppliers for these pharmaceuticals, or whether Skillman Chemists actually purchased the pharmaceuticals with the NDC numbers listed in the billing submissions.

12.     At all relevant times mentioned herein, nearly each and every bill mailed to Plaintiffs by Khaimov through Skillman Chemists for the Fraudulent Pharmaceuticals sought reimbursement for Topical Pain Creams, Topical Pain Patches, or other select NSAIDs and muscles relaxers that the Defendants could readily buy at a low cost and bill to Plaintiffs at inflated amounts based on egregiously high wholesale prices.  Defendants steered the Prescribing No-fault Clinics and prescribing providers to prescribe these pharmaceuticals specifically because of their high profit margins, irrespective of medical necessity, pharmacological outcome, or genuine patient care and despite the availability of cheaper over-the-counter and FDA-approved medications.

13.     On information and belief, by entering into kickback arrangements with the Clinic Controllers and/or Prescribing No-fault Clinics for Topical Pain Creams, Topical Pain Patches and/or a select number of oral medications, and by dispensing these Topical Pain Creams, Topical Pain Patches and other medications irrespective of medical necessity pursuant to bogus prescriptions, Defendants engaged in conduct which demonstrated a blatant disregard for the laws of New York State which govern the proper operation of a pharmacy and the proper dispensing of drug products, as well as laws which prohibit illegal fee splitting and the solicitation of patients.

14.     By way of example and not limitation, New York Education Law § 6509-a, prohibits a professional licensee, such as a pharmacy, from directly or indirectly requesting,

receiving, or participating in the division, transference, assignment, rebate, splitting, or refunding of a fee in connection with professional care or services including services related to drugs and/or medications, and 8 N.Y.C.R.R. § 29.1(b)(3) prohibits a professional licensee, such as a pharmacy from directly or indirectly offering, giving, soliciting, or receiving or agreeing to receive, any fee or other consideration to or from a third party for the referral of a patient or client or in connection with the performance of professional services.

15.     In addition, the Official Compilation of Codes, Rules and Regulations of the State of New York governing Official Prescriptions, Section 910.2(f), states that an order purporting to be a prescription that is not issued for legitimate medical purposes is not a prescription within the meaning of the New York State Education Law and the New York State Public Health Law and the person knowingly dispensing such an order, as well as the person issuing such order, shall be subject to all penalties provided in law or regulations.

16.     The scheme to defraud orchestrated by the Defendants by which they routinely dispensed the Fraudulent Pharmaceuticals, without regard to medical necessity, not only demonstrated a deliberate disregard for the laws of New York State in furtherance of theft from Plaintiffs, but also posed a significant risk to the health of patients.

17.     Khaimov, through Skillman Chemists, fraudulently submitted, or caused to be submitted, bills to Plaintiffs for Topical Pain Creams, Topical Pain Patches and a select variety of oral medications, including NSAIDs and muscle relaxers, that were provided to Covered Persons (i) pursuant to an illegal kickback scheme and/or in exchange for other financial incentives; (ii) pursuant to a pre-determined protocol without regard for medical necessity; (iii) in violation of New York State laws regarding the legal operation of pharmacies and dispensing of

pharmaceuticals; and/or (iv) were the product of illegal and/or invalid prescriptions issued pursuant to collusive agreements.

18.     Separate and apart from the foregoing, pursuant to these arrangements and in exchange for kickbacks and/or other financial compensation, Clinic Controllers, which are not named as defendants in this action, facilitated the scheme in several ways, including but not limited to:

   (i)      ensuring that the Prescribing No-fault Clinics or HCPs prescribed large amounts of virtually identical DME and/or orthotic devices to their patient population, pursuant to a predetermined course of treatment irrespective of medical necessity, with the prescribed items being dictated by Skillman Chemists;

   (ii)     ensuring that the prescriptions were sufficiently generic so that the nature, quality, and cost of any DME and/or orthotic device could not be verified based on the description of the prescribed item alone; and

   (iii)    ensuring that the prescriptions were transmitted and/or delivered directly to Skillman Chemists, thereby depriving Covered Persons the opportunity to have the prescriptions filled by a DME retailer of the Covered Person's choosing and ensuring that Skillman Chemists was provided the documentation it needed to fraudulently bill insurers in general, and Plaintiffs in particular.

19.     The use of generic descriptions in the fraudulent prescriptions enabled the Defendants to: (i) misrepresent the nature and quality of the DME and/or orthotic devices prescribed to the patient, if any items were legitimately prescribed at all; (ii) misrepresent the nature and quality of the items that were dispensed to the patient, if any items were dispensed at all; and (iii) fraudulently bill for products that would result in the highest forms of reimbursement from insurers, in general, and Plaintiffs, in particular.

20.     Pursuant to the fraudulent prescriptions, Skillman Chemists routinely provided (or purported to provide) a nearly identical battery of DME and/or orthotic devices to Covered

Persons, regardless of medical necessity, in order to maximize reimbursement from insurers in general, and Plaintiffs in particular.

21.     On information and belief, the Defendants then paid kickbacks or other forms of compensation to the Clinic Controllers and/or No-fault Clinics for the fraudulent prescriptions, which were transmitted directly by the No-fault Clinics to the Defendants to support their claims for reimbursement.

22.     In furtherance of the scheme to defraud alleged herein, Skillman Chemists purchased the cheap DME and/or orthotic devices in bulk and routinely misrepresented the nature, quality, and cost of the items in order to fraudulently obtain and maximize its reimbursement far in excess of the amounts it was entitled to receive under the No-fault Law.

23.     After obtaining the fraudulent prescriptions from the No-fault Clinics, Khaimov, through Skillman Chemists, generated and submitted bills to Plaintiffs, among others, knowingly misrepresenting the actual amounts they paid for the DME and/or orthotic devices, as well as the nature and quality of the items, and the medical necessity of the purportedly prescribed DME and/or orthotics.

24.     In order to prevent Plaintiffs from determining the appropriate charges associated with any such DME and/or orthotic device, or whether the specific DME and/or orthotic device billed for was medically necessary, the documents submitted to Plaintiffs by Khaimov, through Skillman Chemists, in support of their fraudulent claims, deliberately omitted and/or misrepresented basic information about the DME and/or orthotic devices, including, but not limited to, the manufacturer, make, model, size, features and/or functions of the item and/or included information that was meaningless in determining the kind and quality of any specific DME and/or orthotic device.

25.    At all relevant times mentioned herein, Khaimov, through Skillman Chemists, deliberately omitted any wholesale and/or acquisition invoices from their claim submissions to Plaintiffs in an effort to conceal the actual nature, quality, and purchase price of the items Skillman Chemists purportedly supplied to patients.

26.    At all relevant times mentioned herein, in support of their claims for reimbursement, and to facilitate the fraud described herein, Khaimov, through Skillman Chemists, generated delivery receipts that included a space for the patient's signature to document receipt of each item for which Khaimov, through Skillman Chemists, billed Plaintiffs.

27.    On information and belief, often pursuant to the agreements between the Defendants and the Clinic Controllers, patients were directed to sign these delivery receipts upon presenting to the No-fault Clinics, irrespective of whether any DME and/or orthotic devices were provided to the patient at that time. The Defendants then submitted to Plaintiffs the signed delivery receipts as purported evidence of DME and/or orthotic devices allegedly supplied to a patient, when, in fact, no DME or orthotic device was ever supplied to the patient.

28.    In order to execute the scheme to defraud, at all relevant times mentioned herein, Khaimov, through Skillman Chemists, engaged in one or more of the following actions: (i) paying kickbacks or other financial compensation to No-fault Clinics in exchange for fraudulent prescriptions of DME and/or orthotic devices; (ii) obtaining prescriptions that were provided pursuant to a predetermined course of treatment as opposed to medical need; (iii) obtaining and submitting to insurers, in general, and Plaintiffs, in particular, prescriptions which they knew to be duplicated, fabricated and/or fraudulently altered; (iv) arranging for the No-fault Clinics to have assignments of benefits and acknowledgement of delivery of receipt forms pre-signed by Covered Persons to ensure that they had all of the documents necessary to submit claims to insurers, in

general, and Plaintiffs, in particular, and (v) systematically submitting bills to insurers, in general, and Plaintiffs, in particular, for DME and/or orthotic devices that Khaimov, through Skillman Chemists, determined should be prescribed by the No-fault Clinics, with virtually every Covered Person receiving substantially similar DME and/or orthotic devices.

29.      In each instance, the Defendants knew or should have known that the claims they submitted to Plaintiffs were bogus and contained material and misleading statements regarding the propriety of the billed-for services.

30.      In particular, the Defendants knew or should have known that the claims that they submitted to Plaintiffs were for the Fraudulent Pharmaceuticals, which were provided: (i) pursuant to an illegal kickback scheme and/or in exchange for other financial incentives; (ii) pursuant to a pre-determined protocol without regard for medical necessity; (iii) in violation of New York State laws regarding the legal operation of pharmacies and dispensing of pharmaceuticals; and/or (iv) pursuant to collusive agreements and the product of illegal and/or invalid prescriptions.

31.      Moreover, the Defendants knew or should have known that the claims they submitted to Plaintiffs for DME and/or orthotic devices, to the extent they were provided at all, were provided contained: i) false and misleading statements as to the nature, quality and cost of the DME and/or orthotic devices purportedly supplied to Covered Persons; (ii) false and misleading statements as to the amounts Skillman Chemists was entitled to be reimbursed under the No-fault Law; (iii) false and misleading statements that the DME and/or orthotic devices allegedly supplied were in fact the items supplied to the Covered Persons; (iv) false and misleading prescriptions for the DME and/or orthotic devices purportedly supplied to Covered Persons, which generically described the item(s) in order to conceal the nature, type, and quality of item(s) being prescribed and/or provided; and (v) false and misleading prescriptions for DME and/or orthotic

devices, concealing the fact that the DME and/or orthotic devices either were not prescribed as alleged, or were prescribed and supplied pursuant to a pre-determined, fraudulent protocol, whereby Skillman Chemists paid kickbacks to No-fault Clinics to induce the No-fault Clinics to provide fraudulent prescriptions for large amounts of substantially similar, medically unnecessary DME and/or orthotic devices.

32.   On information and belief, the Defendants willfully engaged in the practices alleged herein with the sole object of converting money.

33.   In addition to payments resulting from fraudulent claims, the fraudulent activities engaged in by Defendants caused Plaintiffs to suffer further economic injury, including, but not limited to, expenditures for verifying each fraudulent claim through examinations under oath, associated attorneys' and court reporting fees, independent medical examinations ("IMEs"), and peer reviews.

34.   It was a foreseeable consequence of Defendants' scheme to defraud that Plaintiffs would incur expenditures in an effort to verify Defendants' fraudulent claims.

35.   At all times relevant herein, but-for the Defendants' fraudulent misrepresentations, Plaintiffs would not have incurred expenditures in an effort to verify Defendants' fraudulent claims.

36.   At all times relevant herein, Defendants fraudulent misrepresentations directly and proximately resulted in Plaintiffs incurring expenditures in an effort to verify the Defendants' fraudulent claims.

37.   The duration, scope and nature of the Defendants' illegal conduct bring this case well within the realm of criminal conduct to which the Racketeering Influenced and Corrupt Organization Act ("RICO") applies. The Defendants adopted fraudulent blueprints regarding the

dispensing of pharmaceuticals, including but not limited to Topical Pain Creams, Topical Pain Patches and a select variety of oral medications, including NSAIDs and muscle relaxers, and regarding the purported dispensing of DME and/or orthotic devices, as their business plan, and used it to participate in a systematic pattern of racketeering activity. Every facet of Defendants' operations, from the creation of fraudulent NF-3s, to the formation of kickback arrangements with the Prescribing No-fault Clinics, to the illegal bulk dispensing of the Fraudulent Pharmaceuticals, to the fraudulent billing, and to the extent anything was dispensed at all, dispensing of DME and/or orthotic devices, to record keeping to billing, was carried out for the purpose of committing fraud.

38.     In carrying out the scheme to defraud, Defendants stole in excess of $167,000.00 from Plaintiffs by submitting, causing to be submitted or facilitating the submission of fraudulent claims for persons who allegedly sustained injuries covered by the New York State Comprehensive Motor Vehicle Insurance Reparations Act, Ins. Law §§ 5101, *et seq*. (popularly known as the "No-fault Law").

39.     This lawsuit seeks to, among other things, enforce the plain language of the No-fault Law and implementing regulations, as well as its underlying public policy, which limits reimbursement of No-fault benefits to legitimate insurance claims for pharmaceutical products.  In doing so, Plaintiffs seek compensatory damages and declaratory relief that Plaintiffs are not required to pay any of Skillman Chemists' claims for the Fraudulent Pharmaceuticals, DME and/or orthotic devices, and other services, submitted to Plaintiffs for reimbursement because they were provided to fill fraudulent prescriptions issued (i) pursuant to an illegal kickback scheme and/or in exchange for other financial incentives; (ii) pursuant to a pre-determined protocol without regard for medical necessity; (iii) in violation of New York State laws regarding the legal operation of pharmacies and dispensing of pharmaceuticals; and/or (iv) pursuant to collusive agreements and

the product of illegal and/or invalid prescriptions. By way of example and not limitation, Exhibit "1" in the accompanying Compendium of Exhibits is a spreadsheet listing a representative sample of fraudulent claims for the Fraudulent Pharmaceuticals, DME and/or orthotic devices, and other services which were paid by Plaintiffs to the Defendants. By way of further example and not limitation, Exhibit "2" in the accompanying Compendium of Exhibits is a spreadsheet listing a representative sample of unpaid No-fault claims from Skillman Chemists of approximately $243,000.00, which form the basis of Plaintiffs' request for declaratory relief. Said spreadsheet is grouped by claim number, date of service and the amount pending.

### STATUTORY/REGULATORY SCHEME

40.     Pursuant to the No-fault Law, Plaintiffs are required to pay, *inter alia*, for health service expenses that are reasonably incurred as a result of injuries suffered by occupants of their insured motor vehicles or pedestrians, which arise from the use or operation of such motor vehicles in the State of New York.  Covered Persons can also assign these benefits to doctors and other properly licensed healthcare providers, including pharmacies, enabling them to bill insurance companies directly for their services.

41.     As alleged herein, the Defendants exploited and continue to exploit the No-fault Law by obtaining such assignments, and dispensing and billing for Topical Pain Creams, Topical Pain Patches, other select oral medications, including NSAIDs and muscle relaxers, DME, and orthotic devices, that if provided at all, were medically unnecessary and provided pursuant to a fraudulent protocol in which in which Covered Persons were prescribed the Fraudulent Pharmaceuticals and/or DME and orthotic devices irrespective of need and/or in violation of state and/or federal law.

42.     Skillman Chemists is ostensibly a licensed pharmacy and DME retailer that bills for pharmaceuticals, DME and orthotic devices provided to, among others, individuals covered under the No-fault Law. In exchange for their services, Skillman Chemists accepted assignments of benefits signed by Covered Persons and submitted claims for payment to No-fault insurance carriers, in general, and to Plaintiffs, in particular.

43.     In accordance with the No-fault Law and 11 N.Y.C.R.R. §§ 65 *et seq*., Skillman Chemists submitted bills for their claims to Plaintiffs using the claim form prescribed by the New York State Department of Financial Services ("DFS," f/k/a the Department of Insurance), known as a "Verification of Treatment by Attending Physician or Other Provider of Health Service" or NF-3 form, or a substantially similar form.

44.     Pursuant to Section 403 of the New York State Insurance Law, the claim forms submitted to Plaintiffs by Skillman Chemists contained the following warning at the foot of the page:

> Any person who knowingly and with intent to defraud any insurance company or other person files an application for insurance or statement of claim containing any materially false information, or conceals for the purpose of misleading, information concerning any fact material thereto, commits a fraudulent insurance act, which is a crime….

45.     Pursuant to the No-fault Law and implementing regulations, as well as the applicable policies of insurance, Plaintiffs were (and are) required to promptly process claims within 30 days of receipt of proof of claim.

46.     Section 5108 of the No-fault Law circumscribes the amount that a licensed healthcare provider or other authorized person, such as a pharmacy, may recover for health service-related expenses. In particular, under this section, such persons are only entitled to reimbursement of necessary medically related expenses in accordance with the applicable fee schedules

established by the Chairman of the Workers' Compensation Board and adopted by the Superintendent of the DFS.

47.     Pursuant to Ins. Law § 5108, the Superintendent of the DFS adopted, by promulgation of Regulation 83, the Workers' Compensation Board ("WCB") Fee Schedules for determining the maximum permissible reimbursement amounts for which health care providers may charge for services provided to Covered Persons under the No-fault law.  11 N.Y.C.R.R. § 68.1.

48.     At all relevant times mentioned herein, Regulation 83 did not adopt the Workers' Compensation Fee Schedules with respect to "workers' compensation claim forms, pre-authorization approval, time limitations within which health services must be performed, enhanced reimbursement for providers of certain designated services..."

49.     Every prescription pharmaceutical product, whether a brand name or generic drug, has a designated national drug code ("NDC") which is a unique 10-digit code that identifies the drug itself, the vendor of the drug and the quantity in which the drug was packaged. Each NDC number has an assigned Average Wholesale Price ("AWP").

50.     Each NDC (and, thus, the AWP) for a particular prescription product differs depending on both the particular supplier the drug is purchased from and the quantity in which the drug is obtained. The same drug can have a different NDC number if it is purchased from a different supplier and/or in different quantities.

51.     The maximum amount that a healthcare provider may charge for a medically necessary prescription drug or product pursuant to the No fault Law is based upon the drug's NDC number.

52. Pursuant to 12 N.Y.C.R.R. §§ 440.5(a) and (d) (the "Pharmacy Fee schedule"), for each brand name drug a provider may charge no more than the AWP assigned to that particular NDC on the day the drug was dispensed minus 12% of the AWP, plus a single dispensing fee of $4.00.

53. For each generic drug, the provider may charge no more than the AWP assigned to that particular NDC on the day the drug was dispensed minus 20% of the AWP, plus a single dispensing fee of $5.00.

54. AWP is defined by 12 N.Y.C.R.R. § 440.2(a) as:

> "[t]he average wholesale price of a prescription drug as provided in the most current release of the Red Book published by Thomson Reuters or Medi-Span Master Drug Database by Wolters Kluwer Health or any successor publisher, on the day a prescription drug is dispensed or other nationally recognized drug pricing index adopted by the Chair or Chair's designee."

55. On information and belief, Skillman Chemists was created for the purpose of participating in the fraudulent billing of insurance companies under the No-fault Law.

56. On information and belief, Defendants intentionally the Fraudulent Pharmaceuticals with extremely expensive AWPs in order to inflate the billing submitted through Skillman Chemists and to maximize their profits.

57. Moreover, at all relevant times mentioned herein, Skillman billed for the DME and/or orthotic devices it purported provided to Covered Persons on the claim forms using Healthcare Common Procedure Coding System (HCPCS) Level II Codes, a standardized coding system maintained by the Centers for Medicare & Medicaid Services (CMS) used to identify services not identified in the American Medical Association's Current Procedural Terminology (CPT) code set, including, *inter alia,* durable medical equipment and orthotic devices.

58.     By Opinion Letter dated June 16, 2004, entitled "No-Fault Fees for Durable Medical Equipment," the New York State Insurance Department recognized the harm inflicted on insureds by inflated DME charges:

> [A]n injured person, with a finite amount of No-Fault benefits available, having assigned his rights to a provider in good faith, would have DME items of inflated fees constituting a disproportionate share of benefits, be deducted from the amount of the person's No-Fault benefits, resulting in less benefits available for other necessary health related services that are based upon reasonable fees.

59.     Effective October 6, 2004, the Department of Financial Services, through the Superintendent's promulgation of the 28th Amendment to Regulation 83 (11 N.Y.C.R.R. § 68 et. seq.), established a fee schedule for the reimbursement of durable medical equipment and medical supplies by adopting the New York State Medicaid fee schedules for durable medical equipment, medical/surgical supplies, orthopedic footwear, and orthotic and prosthetic appliances.

60.     The 28th Amendment to Regulation 83 provided:

> [The] maximum permissible charge for the purchase of durable medical equipment, medical/surgical supplies, orthopedic footwear and orthotic and prosthetic appliances is the fee payable for such equipment and supplies under the New York State Medicaid program at the time such equipment and supplies are provided. If the New York State Medicaid program has not established a fee payable for the specific item, then the fee payable, shall be the lesser of: (1) the acquisition cost (i.e. the line item cost from a manufacturer or wholesaler net of any rebates, discounts or other valuable considerations, mailing, shipping, handling, insurance costs or any sales tax) to the provider plus 50%; or (2) the usual and customary price charged to the general public.

11 N.Y.C.R.R. § 68 (Appendix 17-C, Part F) (effective through July 10, 2007).

61.     Effective July 11, 2007, for DME and/or orthotic devices provided up to and including April 3, 2022, the WCB established a fee schedule for DME and orthotic devices by also adopting the New York State Medicaid fee schedule for durable medical equipment,

medical/surgical supplies, orthopedic footwear, and orthotic and prosthetic appliances (hereinafter the "Medicaid DME Fee Schedule"). 12 N.Y.C.R.R. § 442.2(a) (effective through June 7, 2021).

62.     In view of the adoption by the WCB of the Medicaid DME Fee Schedule, on or about April 16, 2008, the DFS promulgated the 30th Amendment to Regulation 83, which repealed Part F of Appendix 17-C, since it was no longer needed due to the DFS' prior adoption of the WCB's fee schedule, which then included the Medicaid DME Fee Schedule that was, and is, in effect at all relevant times mentioned herein prior to April 4, 2022.

63.     Accordingly, at all relevant times mentioned herein for DME and/or orthotic devices provided prior to April 4, 2022, providers of DME are entitled to reimbursement in the amounts set forth in the Medicaid DME Fee Schedule.  At all relevant times mentioned herein, with respect to items not listed on the Medicaid DME Fee Schedule provided prior to April 4, 2022 (hereinafter "Non-Medicaid DME Fee Schedule" items), the provider is only entitled to reimbursement in an amount equal to the *lesser* of either: (i) the net acquisition cost of the medical equipment to the provider, plus 50%, or (ii) the usual and customary price charged to the public (sometimes referred to herein as the "Lesser of Standard"). 11 N.Y.C.R.R. § 68.1; 12 N.Y.C.R.R. § 442.2(a) (effective through June 7, 2021).

64.     By Board Bulletin Numbers 046-1408, dated May 24, 2021, and 046-1496, dated February 3, 2022, the Chair of the WCB delayed the implementation of amendments to 12 N.Y.C.R.R. §§ 442.2, 442.4 and 442.5, which was to become effective June 7, 2021, with the result that the Medicaid DME Fee Schedule and the Lesser of Standard remained effective for Workers' Compensation and No-fault claims until the completion of Phase 2 of the WCB's implementation of its new electronic claims management system, OnBoard on April 4, 2022. New York Workers' Compensation        Board        Bulletin        Nos.        046-1408        (May        24,        2021)

(http://www.wcb.ny.gov/content/main/SubjectNos/sn046_1408.jsp), 046-1496 (Feb. 3, 2022)

(http://www.wcb.ny.gov/content/main/SubjectNos/sn046_1496.jsp).

65.     In relevant part, for DME and/or orthotic devices provided on or after April 4, 2022, the WCB established its own fee schedule for DME and orthotic devices to replace its prior adoption of the Medicaid DME Fee Schedule for durable medical equipment, medical/surgical supplies, orthopedic footwear, and orthotic and prosthetic appliances. (hereinafter "WCB DME Fee Schedule") *See* 12 N.Y.C.R.R. § 442.2(a) (WCB DME Fee Schedule and Medicaid DME Fee Schedule are collectively referred to as the "Fee Schedule").

66.     Like the Medicaid DME Fee Schedule, the WCB DME Fee Schedule lists DME and orthotic devices by their corresponding HCPCS Level II Codes.

67.     As part of the WCB amendment of 12 N.Y.C.R.R. § 442.2 and adoption of the WCB DME Fee Schedule, the available DME on the applicable Fee Schedule was updated, the reimbursement rates were increased, and the Lesser of Standard was replaced with a prior authorization process for DME not listed in the WCB DME Fee Schedule or for which no reimbursement rate is listed.

68.     Except as rendered inapplicable to reimbursement of No-fault claims by Regulation 83, the WCB DME Fee Schedule applies to the reimbursement of items listed in the WCB DME Fee Schedule.

69.     The Department of Financial Services recognized that the WCB's elimination of the Lesser of Standard for reimbursement of items not listed on the WCB DME Fee Schedule in its amendment of 12 N.Y.C.R.R. § 442.2 creates a system, in the context of reimbursement under the No-fault law, for fraud and abuse, with no cost-containment systems in place and the possibility for nefarious DME providers to bill for DME at exorbitant, unchecked rates.

70.     To address the potential for fraud and abuse, by emergency adoption of the 36th Amendment to Regulation 83 dated April 4, 2022, the DFS reinstated the Lesser of Standard for reimbursement of DME under the No-fault law.

71.     By Emergency Adoptions dated June 30, 2022, September 27, 2022, and December 28, 2022, DFS extended its reinstatement of the Lesser of Standard for reimbursement of DME under the No-fault law, in each instance, for an additional 90 days.

72.     DFS promulgated its final Adoption of the 36th Amendment to Regulation 83, including its reinstatement of the Lesser of Standard, effective February 15, 2023, which states in relevant part as follows:

**Part E. Durable medical equipment fee schedule.**

(a) This Part shall apply to durable medical equipment not listed in the Official New York Workers' Compensation Durable Medical Equipment Fee Schedule and to durable medical equipment listed in the Official New York Workers' Compensation Durable Medical Equipment Fee Schedule for which no fee for purchase, rental, or both has been assigned.

(b) As used in this Part, acquisition cost means the line-item cost to the provider from a manufacturer or wholesaler net of any rebates, discounts or valuable consideration, mailing, shipping, handling, insurance costs or sales tax.

(c) The maximum permissible purchase charge for such durable medical equipment shall be the lesser of the:

(1)     acquisition cost plus 50%; or

(2)     usual and customary price charged by durable medical equipment providers to the general public.

https://www.dfs.ny.gov/system/files/documents/2023/02/rf_ins_83_amend36_text.pdf

73.     Accordingly, at all relevant times mentioned herein for DME and/or orthotic devices provided from April 4, 2022, through the present, providers of DME are entitled to reimbursement in the amounts set forth in the WCB DME Fee Schedule.  At all relevant times mentioned herein, with respect to items not listed on the WCB DME Fee Schedule provided prior to April 4, 2022 (hereinafter "Non-WCB DME Fee Schedule" items; Non-Medicaid DME Fee

Schedule items and Non-WCB DME Fee Schedule items at times collectively referred to herein as "Non-Fee Schedule" items), the provider is still only entitled to reimbursement in an amount equal to the *lesser* of either: (i) the acquisition cost of the medical equipment to the provider, plus 50%, or (ii) the usual and customary price charged to the general public. 11 N.Y.C.R.R. § 68.1; 11 N.Y.C.R.R. § App.17-C Part E(c).

74.     At all relevant times mentioned herein from April 4, 2022, through the present, a provider's acquisition cost is "the line-item cost to the provider from a manufacturer or wholesaler net of any rebates, discounts or valuable consideration, mailing, shipping, handling, insurance costs or sales tax. 11 N.Y.C.R.R. § App.17-C Part E(b).

75.     At all relevant times mentioned herein, pursuant to Section 5108(c) of the No-fault Law, "no provider of health services . . . may demand or request any payment in addition to the charges authorized pursuant to this section."

76.     Moreover, to be eligible for reimbursement under the No-fault Law during all relevant times mentioned herein, all claims for reimbursement must include a description of the "full particulars of the nature and extent of the . . . treatment received," including DME. *See* 11 N.Y.C.R.R. § 65-1.1.

77.     On information and belief, every aspect of Defendants' fraudulent scheme was motivated by money, without regard to the grave harm inflicted on the public at large by the Defendants, to the extent that they provided any Fraudulent Pharmaceuticals, DME and/or orthotics devices at all.

## NATURE OF THE ACTION

78.     This action is brought pursuant to:

    i)      The United States Racketeer Influenced and Corrupt Organizations Act ("RICO"); 18 U.S.C. § 1962(c);

    ii)     New York State Common Law; and

    iii)    The Federal Declaratory Judgment Act, 28 U.S.C. § 2201.

## NATURE OF RELIEF SOUGHT

79.     Plaintiffs seek treble damages that they sustained as a result of the Defendants' schemes and artifices to defraud, and acts of mail fraud (pursuant to 18 U.S.C. § 1341), in connection with their use of the facilities of the No-fault system and its assignment of benefits mechanism to fraudulently obtain payments from Plaintiffs for pharmaceutical products, including but not limited to Topical Pain Creams, Topical Pain Patches, select oral medications, DME and/or orthotic devices that it allegedly dispensed to individuals covered by Plaintiffs under New York State's No-fault Law.

80.     Plaintiffs seek compensatory and punitive damages under the Common Law.

81.     Plaintiffs further seek recovery of the No-fault claim payments made under the independent theory of unjust enrichment.

82.     Plaintiffs further seek a judgment declaring that they are under no obligation to pay any of Defendants' unpaid No-fault claims for Topical Pain Creams, Topical Pain Patches, select other oral medications, including NSAIDs and muscle relaxers, DME and orthotic devices, which were dispensed pursuant to the fraudulent schemes set forth herein.

83.     As a result of Defendants' actions alleged herein, Plaintiffs were defrauded an amount in excess of $167,000.00, the exact amount to be determined at trial, in the form of

payments to Defendants and/or expenses incurred by Plaintiffs as a result of Defendants fraudulently billing Plaintiffs for Topical Pain Creams, Topical Pain Patches, select other oral medications, primarily in the form of oral pain relievers and muscle relaxants, DME and/or orthotic devices, that they knew or should have known were provided to fill fraudulent prescriptions procured (i) pursuant to an illegal kickback scheme and/or in exchange for other financial incentives; (ii) pursuant to a pre-determined protocol without regard for medical necessity; (iii) in violation of New York State laws regarding the legal operation of pharmacies and dispensing of pharmaceuticals; and/or (iv) pursuant to collusive agreements that were the product of illegal and/or invalid prescriptions.

## THE PARTIES

A.   **Plaintiffs**

84.   Plaintiff Allstate Insurance Company is a corporation duly organized and existing under the laws of the State of Illinois, having its principal place of business in Northbrook, Illinois.

85.   Plaintiff Allstate Fire and Casualty Insurance Company is a corporation duly organized and existing under the laws of the State of Illinois, having its principal place of business in Northbrook, Illinois.

86.   Plaintiff Allstate Indemnity Company is a corporation duly organized and existing under the laws of the State of Illinois, having its principal place of business in Northbrook, Illinois.

87.   Plaintiff Allstate Property and Casualty Insurance Company is a corporation duly organized and existing under the laws of the State of Illinois, having its principal place of business in Northbrook, Illinois.

88.   Allstate Insurance Company, Allstate Fire and Casualty Insurance Company, Allstate Indemnity Company, and Allstate Property and Casualty Insurance Company are collectively referred to herein as "Plaintiffs."

B.       **Defendants**

89.       Vyacheslav Khaimov ("Khaimov") is a natural person residing in the State of New York and is the principal record owner, officer and/or operator of Defendant Skillman Chemists, and at all times relevant herein, operated, managed, and/or controlled its activities.

90.       Skillman Chemists Corp. ("Skillman Chemists") formed on or about May 24, 2021, was first licensed as Dealer in Goods for the Disabled with the New York City Department of Consumer and Worker Protection on July 8, 2023, first registered as a pharmacy with the New York State Office of Professions on October 14, 2021, and purports to operate its principal place of business located at 48-11 Skillman Avenue, Sunnyside, New York 11104.  Skillman Chemists is operated, managed, and/or controlled by Defendant Khaimov and submitted fraudulent claims to Plaintiffs seeking reimbursement for pharmaceutical products under the No-fault Law.

91.       On information and belief, John Does 1 through 5 are individuals who conspired, participated, conducted, and assisted in the fraudulent and unlawful conduct alleged herein. These individuals will be added as defendants when their names and the extent of their participation become known through discovery.

92.       On information and belief, the ABC Corporations 1 through 5 are additional companies that are unknown to Plaintiffs that are owned, controlled, and operated by one or more of the John Doe Defendants, which were used in connection with the kickback scheme with the Defendants alleged herein to obtain referrals, prescriptions and/or patients in furtherance of the scheme.  These ABC Corporations 1 through 5 will be added as defendants when their names and the full extent of their participation become known through discovery.

## JURISDICTION AND VENUE

93.     The jurisdiction of the Court arises under the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961, *et seq.*; 28 U.S.C. §§ 1331; and principles of pendent jurisdiction.

94.     This Court also has jurisdiction over the subject matter of this action under 28 U.S.C. § l332 because the matter in controversy exceeds the sum or value of $75,000.00, exclusive of interest and costs, and is between citizens of different states.

95.     The Court has supplemental jurisdiction over the claims arising under state law pursuant to 28 U.S.C. § 1367(a), and the claim for declaratory relief based upon 28 U.S.C. § 2201 and § 2202.

96.     Pursuant to 18 U.S.C. § 1965, 28 U.S.C. § 1367 and New York C.P.L.R. § 302(a), this Court has personal jurisdiction over any non-domiciliary defendant.

97.     Venue lies in this District Court under the provisions of 28 U.S.C. § 1391, as the Eastern District of New York is the District where one or more Defendants reside and because this is the District where a substantial amount of the activities forming the basis of the Complaint occurred.

## FACTUAL BACKGROUND

98.     Plaintiffs underwrite automobile insurance in New York State and participate as insurers in New York State's No-fault program.

99.     Under the Comprehensive Motor Vehicle Insurance Reparations Act of New York State, Ins. Law §§ 5101, *et seq.*, Plaintiffs are required to pay, *inter alia*, for health service expenses that are incurred as a result of injuries suffered by occupants of their insured motor vehicles and pedestrians that arise from the use or operation of such motor vehicles in the State of New York.

100.    The Defendants purportedly dispensed pharmaceutical products, DME, and orthotic devices to Covered Persons for the purported treatment of soft tissue injuries, such as sprains, and musculoskeletal pain and submitted claims for payment to Plaintiffs for such services.

101.    In purported compliance with the No-fault Law and 11 N.Y.C.R.R. 65 et seq., the Defendants submitted proof of their claims to Plaintiffs using a "Verification of Treatment by Attending Physician or Other Provider of Health Service" or NF-3 form or a substantially similar form.

102.    Pursuant to Section 403 of the New York State Insurance Law, the claim forms submitted to Plaintiffs by the Defendants contained the following (or substantially similar) warning on the back of the claim form:

> Any person who knowingly and with intent to defraud any insurance company or other person files an application for insurance or statement of claim containing any materially false information, or conceals for the purpose of misleading, information concerning any fact material thereto, may be guilty of a criminal act punishable under law and may be subject to civil penalties.

103.    Pursuant to the No-fault Law and implementing regulations, as well as the applicable policies of insurance, Plaintiffs are required to promptly process claims within 30 days of receipt of the proof of claim.

104.    To fulfill their obligation to promptly process claims, Plaintiffs justifiably relied upon the bills and documentation submitted by Khaimov through Skillman Chemists in support of their claims for pharmaceutical products, DME and orthotic devices, and paid Skillman Chemists based on the representations and information that Defendants submitted to Plaintiffs.

105.    At all relevant times Skillman Chemists was an illegal enterprise that engaged in common, systematic, and pervasive fraudulent practices.

106.     Skillman Chemists, which is purportedly owned, operated, and controlled by Khaimov was part of a racketeering scheme that distinguished it from a legitimate healthcare provider/pharmacy as follows:

- Unlike legitimate pharmacies, Skillman Chemists routinely misrepresented that it was dispensing Fraudulent Pharmaceuticals pursuant to legitimate New York State Prescriptions, when it was not;

- Unlike legitimate pharmacies, Skillman Chemists dispensed pharmaceuticals to fill fraudulent and boilerplate prescription forms it received from the Prescribing No-fault Clinics pursuant to illicit kickback agreements;

- Unlike legitimate pharmacies, Skillman Chemists misrepresented that it was in conformance with material licensing requirements which would entitle it to reimbursement of No-fault benefits when, in fact, it was involved in collusive relationships with providers that issue illegal prescriptions pursuant to an unlawful kickback arrangement and/or other financial incentives;

- Unlike legitimate pharmacies, Skillman Chemists entered into kickback agreements with No-fault Clinics in order to generate a large volume of prescriptions pursuant to a fraudulent, pre-determined treatment and billing protocol whereby Covered Persons received Topical Pain Creams, Topical Pain Patches and/or other oral medications irrespective of medical necessity.

107.     Skillman Chemists also purported to be a retailer of DME and orthotic devices, but as part of the racketeering scheme dictated by Khaimov, engaged in one or more of the following practices:

- Unlike legitimate retail DME companies, Khaimov, through Skillman Chemists, misrepresented the nature, quality, and cost of DME and/or orthotic devices purportedly provided to Covered Persons;

- Unlike legitimate retail DME companies, Khaimov, through Skillman Chemists, submitted bills to Plaintiffs misrepresenting the amounts they were entitled to be reimbursed under the No-fault Law;

- Unlike legitimate retail DME companies, Khaimov, through Skillman Chemists, submitted bills to Plaintiffs for DME and/or orthotic devices that were never provided to Covered Persons;

- Unlike legitimate retail DME companies, Khaimov, through Skillman Chemists, misrepresented the acquisition costs and/or usual and customary

price of the Non-fee Schedule items purportedly supplied to Covered Persons;

- Unlike legitimate retail DME companies, Khaimov, through Skillman Chemists, submitted bills to Plaintiffs reflecting prices far in excess of those actually paid, concealing that the items actually supplied were far less expensive than the amounts indicated in the bills for any particular item;

- Unlike legitimate retail DME companies, Khaimov, through Skillman Chemists, submitted prescriptions, bills, and delivery receipts to Plaintiffs for DME and/or orthotic devices that generically described the item(s) so as to conceal the type of item(s) being prescribed and/or provided;

- Unlike legitimate retail DME companies, Khaimov, through Skillman Chemists, concealed the fact that the DME and/or orthotic devices were prescribed and supplied pursuant to a pre-determined, fraudulent protocol pursuant to a kickback or other financial arrangement with No-fault Clinics;

- Unlike legitimate retail DME companies, Khaimov, through Skillman Chemists and/or those acting under their direction and control, had agreements and/or understandings as to what generic DME and/or orthotic devices would be prescribed by the No-fault Clinics;

- Unlike legitimate retail DME companies, Khaimov, through Skillman Chemists, arranged for the generic language on the prescription forms in order to unilaterally determine the DME and/or orthotic devices to be provided to patients and billed to insurers, in general, and Plaintiffs in particular; and/or

- Unlike legitimate retail DME companies, Khaimov, through Skillman Chemists, arranged to have prescriptions for DME and/or orthotic devices delivered to them directly by the No-fault Clinics, rather than allowing the patients to select their own DME supply company.

108. The members of the enterprise alleged herein played well-defined and essential roles in the Defendants' scheme to defraud and in directing the affairs of the enterprises. By way of example and not limitation, in furtherance of their scheme to defraud, on information and belief, Khaimov engaged in one or more the following:

- Entered into kickback or other financial arrangements with No-fault Clinics, not named as defendants in this action, to (i) issue prescriptions for large amounts of virtually identical Topical Pain Creams, Topical Pain Patches, select NSAIDs, muscle relaxers, and DME and/or orthotic devices to their patient population, and/or (ii) fabricate and/or fraudulently alter prescriptions, in order to conform the prescriptions to a predetermined course of treatment, irrespective of medical necessity;

- Submitted or caused to be submitted, on behalf of Skillman Chemists, numerous fraudulent claim forms seeking payment for Topical Pain Creams, Topical Pain Patches, select NSAIDs, muscle relaxers, and DME and/or orthotic devices that were purportedly (but not actually) provided to many Covered Persons;

- Prepared or caused to be prepared fraudulent bills to be mailed to Plaintiffs; and/or

- Mailed or caused those acting under their direction to mail bogus claims to Plaintiffs, knowing that they contained materially false and misleading information.

109.   At all relevant times mentioned herein, Khaimov knew that the prescriptions provided by the No-fault Clinics were fraudulent in that they were issued pursuant to a fraudulent treatment protocol at the No-fault Clinic in connection with an unlawful referral and/or kickback scheme for medically unnecessary Topical Pain Creams, Topical Pain Patches, select NSAIDs, muscle relaxers, and DME and/or orthotic devices.

110.   At all relevant times mentioned herein, Khaimov through Skillman Chemists, directly or through others acting under and pursuant to their direction, instruction, and control, submitted or caused to be submitted the fraudulent prescription and/or claim forms, in furtherance of the scheme to defraud alleged herein, to obtain payment in connection with fraudulent claims.

111.   At all relevant times mentioned herein, Khaimov and the No-fault Clinics, acting in concert with each other, participated in, conducted, controlled, conspired together, aided and abetted and furthered the fraudulent schemes through a common course of conduct and purpose, which was to defraud insurers, in general, and Plaintiffs, in particular, of money.

112.   In these and numerous other ways, Defendants sought to deceive Plaintiffs into paying fraudulent claims that typically exceeded thousands of dollars per Covered.

## *Overview of Guidelines for Topical Pain Medications*

113.   On information and belief, topical pain medications, such as Diclofenac Sodium gel 3%, Lidocaine 5% ointment, and Lidothol or its generic formulation, Lidocaine 4.5%-Menthol

5% transdermal patches, are a type of pain-relief medications that are "locally administered treatments".

114.    The role of topical pain medications in pain management is not a scientifically proven fact. By way of example and not limitation, according to medical literature, due to the absence of specific compliance and adherence studies comparing topical treatment versus traditional routes in pain management, the role of topical preparations in patient adherence remains obscure.

115.    Topical pain creams should undergo trials, including in the case of topical lidocaine, a trial in the range of 2-4 weeks.

116.    The ingredients used in the Topical Pain Creams include NSAIDs, which is not always appropriate in some clinical settings. For example, it is well known that people who use NSAIDs (other than aspirin) may have a higher risk of having a heart attack or a stroke than people who do not use those medications, and these events may happen without warning and may even cause death.

117.    The medical standard in reference to topical drug delivery, as presented in the Workers Compensation Board New York Non-Acute Pain Medical Treatment Guidelines, First Edition, September 15, 2014, pages: 37-38, and current edition, effective May 2, 2022, page 39, states the following: "For most patients, the effects of long-term use are unknown and thus may be better used episodically. These agents may be used in those patients who prefer topical treatments over oral medications."

118.    According to the latest Workers Compensation Board Medical Treatment Guidelines (First Edition, September 15, 2014, pages: 28-38; Current edition, effective May 2,

2022, page 32) regarding Non-Acute Pain, "Topical, oral, and/or systemic compound medications are not recommended."

### *Overview of New York State Laws and Regulations Regarding Operations of Legitimate Pharmacies*

119.    Pursuant to New York State law, a provider of healthcare services is not entitled to reimbursement for No-fault Benefits if the provider fails to meet any applicable New York state or local licensing requirement necessary to perform such service in New York. *See* 11 N.Y.C.R.R. § 65-3.16(a)(12).

120.    New York Education Law § 6808, prohibits a person, firm, corporation, or association from possessing drugs, prescriptions, or poisons for the purpose of compounding, dispensing, retailing, wholesaling, or manufacturing, or offering drugs, prescriptions, or poisons for sale at retail or wholesale unless they are registered by the New York State Department of Education as a pharmacy, wholesaler, manufacturer, or outsourcing facility.

121.    New York Education Law § 6530(38) prohibits a licensed physician from entering into an arrangement or agreement with a pharmacy for the compounding and/or dispensing of secret formula ("coded") or specially marked prescriptions.

122.    New York Education Law § 6810(7)(a) prohibits pharmacies from dispensing a drug when a prescription form for the drug includes any other drug.

123.    New York Education Law § 6810(9) prohibits persons and corporations, not licensed to issue a prescription, to willfully cause prescription forms, blanks, or facsimiles thereof to be disseminated to any person other than a person who is licensed to issue a prescription.

124.    New York Education Law § 6811 makes it a crime for any person to enter into an agreement with a physician (or other licensed healthcare provider) for the compounding or dispensing of coded prescriptions.

125.   New York Education Law § 6509-a prohibits a professional licensee from "directly or indirectly" requesting, receiving, or participating in the division, transference, assignment, rebate, splitting, or refunding of a fee in connection with professional care or services including services related to drugs and/or medications.

126.   8 N.Y.C.R.R. § 29.1(b)(3) prohibits a professional licensee from "directly or indirectly" offering, giving, soliciting, or receiving or agreeing to receive, any fee or other consideration to or from a third party for the referral of a patient or client or in connection with the performance of professional services.

127.   New York Education Law § 6530(18) prohibits a licensed physician from "directly or indirectly" offering, giving, soliciting, receiving, or agreeing to receive any fee or other consideration to or from a third party in exchange for patient referrals or in connection with the performance of professional services.

128.   New York Education Law § 6530(17) prohibits pharmacies and other health care professionals from "[e]xercising undue influence" over a patient, including by the "promotion of the sale of services, goods, appliances, or drugs in such manner as to exploit the patient for the financial gain of the licensee or of a third party."

129.   8 N.Y.C.R.R. §29.1(b)(2) further provides that it constitutes professional misconduct when a pharmacies or other health care professionals "exercise[] undue influence" over a patient or client including by the "promotion of the sale of services, goods, appliances, or drugs in such manner as to exploit the patient for the financial gain of the licensee or of a third party."

130.   8 N.Y.C.R.R. § 63.6(b)(7) requires that pharmacists "conduct a prospective drug review before each prescription is dispensed or delivered to a patient or person authorized to act

on behalf of the patient. Such review shall include screening for potential drug therapy problems due to therapeutic duplication, drug-drug interactions, including serious interactions with over-the-counter drugs, incorrect drug dosage or duration of drug treatment, drug-allergy interactions, and clinical abuse or misuse."

131.    New York Education Law § 6808(2)(c), requires that the "names of the owner or owners of a pharmacy shall be conspicuously displayed upon the exterior of such establishment. The names so displayed shall be presumptive evidence of ownership of such pharmacy by such person or persons."

132.    New York Education Law § 6808(e) requires that every pharmacy shall be under the immediate supervision and management of a licensed pharmacist.

133.    New York Education Law § 6808(e) provides that pharmacy owners and supervising pharmacists shall be responsible for the proper conduct of a pharmacy.

134.    New York Education Law § 6808(e) provides that pharmacy owners are responsible "for the strength, quality, purity and the labeling thereof of all drugs, toxic substances, devices and cosmetics, dispensed or sold, subject to the guaranty provisions of this article and the public health law."

135.    New York Education Law § 6808(h) requires that individual applicants and all officers, directors, and shareholders with at least ten percent interest in corporate applicants "shall be over good moral character."

## MECHANICS OF THE SCHEMES TO DEFRAUD

136.    Beginning in 2021 and continuing until the present day, Defendants and others not named in the Complaint have engaged in a systematic fraudulent billing scheme based upon the

alleged provision of Topical Pain Creams, Topical Pain Patches, other select oral medications, such as NSAIDs and muscle relaxers, DME and orthotic devices to Covered Persons.

137.     Defendant Khaimov, through Skillman Chemists, devised and carried out a scheme to fraudulently bill insurers, in general, and Plaintiffs, in particular, by making material misrepresentations in bill submissions to Plaintiffs and fraudulently billing for the Fraudulent Pharmaceuticals, which were provided, if at all, irrespective of medical necessity, pursuant to fraudulent prescriptions based upon a pre-determined treatment protocol, and further, cost the Defendants a fraction of the amounts that they materially misrepresented in their fraudulent bill submissions to Plaintiffs.

138.     Defendants engaged in a massive scheme to defraud in which Khaimov, through Skillman Chemists, as a matter of pattern, practice and protocol, dispensed, or caused to be dispensed, expensive Topical Pain Creams, including Diclofenac 3% gel and Lidocaine 5% ointment, Topical Pain Patches, including Lidothol patches, and other specifically targeted, select oral medications, including NSAIDs and muscle relaxers, to Covered Persons pursuant to a predetermined protocol irrespective of medical necessity.

139.     In 2015, the Department of Health and Human Services, Office of the Inspector General, issued a report noting the potential for fraud in abuse by pharmacies in New York related to the prescription, among other topical pain medications, diclofenac sodium 3% gel, and lidocaine 5% pain patches. *See Questionable Billing and Geographic Hotspots Point to Potential Fraud and Abuse in Medicare Part D,* OEI-02-15-00190 (June 2015)

140.     Moreover, In 2018, the U.S. Department of Health and Human Services, Office of the Inspector General, issued a report noting that fraud and abuse by pharmacies was significant in the prescribing and dispensing of products containing diclofenac and/or lidocaine.  *See,*

*Questionable Billing for Compounded Topical Drugs in Medicare Part D*, OEI-02-16-00440 (August 2018).

141.     Here, by way of example and not limitation, the Fraudulent Pharmaceuticals account for over 80% of the billing for prescription pharmaceuticals to Plaintiffs from Skillman Chemists.

142.     Skillman Chemists purports to be a storefront pharmacy operating in Astoria, New York, but does not advertise to the general public or otherwise market or seek business from individual patients.

143.     Instead, as part of their pattern, practice and protocol, and in furtherance of their massive scheme to defraud, Defendants entered into illegal, collusive agreements whereby the Defendants paid kickbacks to No-fault Clinics and Clinic Controllers in exchange for the No-fault Clinics' and prescribing providers' prescribing large volumes of the Fraudulent Pharmaceuticals, DME and orthotic devices, which were specifically targeted for their high profit margins, and directing these prescriptions to be dispensed and billed by Skillman Chemists.

144.     In fact, a vast majority of the billing that Skillman Chemists submitted to Plaintiffs for reimbursement of pharmaceuticals and medical equipment dispensed, if at all, to Covered Persons came from a few prescribing physicians or practices, with a history of engaging in fraudulent No-fault billing schemes.

145.     By way of example but not limitation, numerous fraudulent prescriptions submitted in claims for reimbursement from Skillman Chemists to Plaintiffs were issued by medical providers that purportedly provided services through Atlantic Medical & Diagnostic PC, a professional corporation in which Jonathan Landow ("Landow") is listed as the record owner and which operates out of several locations throughout the New York metropolitan area.  Landow and several of his professional corporations in which he is listed as the record owner, including Atlantic Medical &

Diagnostic, P.C., have been sued by multiple No-fault insurance carriers for allegedly engaging in a multimillion-dollar fraud scheme involving, among other things, rendering healthcare services pursuant to fraudulent billing and treatment protocols and engaging in illegal kickback and referral arrangements. *See, e.g., Allstate Ins. Co., et al, v. Landow, M.D., et al.*, 24-cv-02010 (E.D.N.Y.); *Government Emp. Ins. Co., et al. v. Landow, M.D., et al.*, 21-cv-01440 (E.D.N.Y.); *Government Emp. Ins. Co., et al. v. Urban Medical, P.C., M.D., et al.*, 18-cv-02956 (E.D.N.Y.); *Travelers Pers. Ins. Co., et al. v. Landow, M.D., et al.*, Index No. 656567/2021 (N.Y. Sup. Ct., N.Y. County).

146. By way of further example but not limitation, numerous other prescriptions routed to Skillman Chemists were issued by Colin Clarke, M.D., who, along with the professional corporation, Colin Clarke, M.D., P.C. in which he is listed as the record owner, has been sued by multiple No-fault insurance carriers for engaging in various multimillion-dollar fraud schemes involving, among other things, rendering healthcare services pursuant to fraudulent billing and treatment protocols and engaging in illegal kickback and referral arrangements. *See Government Employees Ins. Co., et al. v. Colin Clarke, M.D., et al.*, 23-cv-4605 (FB)(SJB) (E.D.N.Y. 2023); *Allstate Ins. Co., et al. v. Anthony Rose, et al.*, 22-cv-00279 (E.D.N.Y.)., *Travelers Indem. Co. v. Valley Psychological, P.C., et al.*, 11-cv2834 (NGG)(RER) (E.D.N.Y.).

147. The Fraudulent Pharmaceuticals were prescribed and dispensed pursuant to a predetermined protocol that lacked individualized care, was designed to exploit patients for financial gain, was implemented without regard to pharmacologic outcomes and was implemented with gross indifference to a patient's health and safety.

148. On information and belief, in connection with the unlawful financial arrangements with No-fault Clinics, the Defendants would pay kickbacks to individuals associated with the No-fault Clinics in order to obtain referrals for the fraudulent Topical Pain Creams, Topical Pain

Patches, select NSAIDs, muscle relaxers, and DME and/or orthotic devices to be provided to Covered Persons who treated at the Clinics.

149.    On information and belief, in keeping with the fact that the prescriptions for Topical Pain Creams, Topical Pain Patches, select NSAIDs, muscle relaxers, and DME and/or orthotic devices were the result of unlawful kickbacks and/or referral relationships between the pharmacy and the Clinics, Khaimov never met most of the physicians who purportedly signed the prescriptions that were provided to the Defendants.  Moreover, a number of the prescriptions submitted by Khaimov, through Skillman Chemists, to Plaintiffs were fabricated in order to misrepresent that medications were medically necessary, when in fact, the medications and/or DME were provided, if at all, to financially enrich Khaimov through a fraudulent protocol of treatment.

150.    Further, the prescriptions from the Clinics were sent to and obtained by Skillman Chemists directly from the Clinics without any communication or involvement by the Covered Persons.  In further keeping with the fact that the prescriptions for the Topical Pain Creams were the result of unlawful financial arrangements between the Defendants and the No-fault Clinics, the Covered Persons were never given access to the prescriptions or given the option to use any other pharmacy or DME retailer other than Skillman Chemists.

151.    At all relevant times mentioned herein, the Topical Pain Creams, Topical Pain Patches, select NSAIDs, muscle relaxers, and DME and/or orthotic devices supplied by Skillman Chemists was provided pursuant to a predetermined course of treatment, irrespective of medical necessity, based on illicit kickback and/or other financial compensation agreements between and among one or more of the Defendants and the No-fault Clinics, who provided the prescriptions to Skillman Chemists to be used in support of the fraudulent Topical Pain Creams, Topical Pain Patches, select NSAIDs, muscle relaxers, and DME and/or orthotic devices that exploited and

manipulated the payment formulas under the applicable Fee Schedule in order to maximize the charges that they could submit to Plaintiffs and other insurers.

152.    As a result of the unlawful kickback and/or other financial compensation agreements, the Defendants obtained large numbers of prescriptions and access to Covered Persons' identifying information that enabled them to bill hundreds of thousands of dollars to Plaintiffs, for just a few exorbitantly priced Topical Pain Creams, Topical Pain Patches, select NSAIDs, muscle relaxers, and DME and/or orthotic devices.

153.    But for the payment of kickbacks from the Defendants, the No-fault Clinics, would not have had any reason to: (i) direct a substantial number of medically unnecessary prescriptions to Skillman Chemists; (ii) make the Covered Persons' information available to Skillman Chemists; and/or (iii) provide Skillman Chemists with the fraudulent prescriptions.

154.    Upon information and belief, the payment of kickbacks and/or other financial compensation  by the Defendants was made at or near the time the prescriptions were issued, but the Defendants and the No-fault Clinics affirmatively concealed the particular amounts paid since the payment of kickbacks in exchange for patient referrals violates New York law.

155.    As a result of the unlawful financial arrangements, the Defendants billed hundreds of thousands of dollars to Plaintiffs, and likely millions of dollars to other New York automobile insurers, for the Topical Pain Creams, Topical Pain Patches, select NSAIDs, muscle relaxers, and DME and/or orthotic devices.

## THE FRAUDULENT PHARMACEUTICALS SCHEME TO DEFRAUD

156.    As part of Defendants' scheme to defraud, Defendants entered into kickback or other financial arrangements with the Prescribing No-fault Clinics and/or HCPs, who instead of prescribing cheaper FDA-approved and/or commercially available medication to Covered Persons, would instead prescribe and/or dispense the Topical Pain Creams, including Diclofenac 3% gel

and Lidocaine 5% ointment and/or Topical Pain Patches, which were prescribed without regard to the efficacy and/or medical necessity of the drugs, and often combined these topical medications with prescriptions for other select oral medications, including NSAIDs and muscle relaxers, which constituted therapeutic duplication, increasing the risk for adverse events in the Covered Persons without any additional therapeutic benefit.

157.    Regardless of whether a Covered Person was seen by a doctor on the date of the initial office visit at any of the Prescribing No-fault Clinics, a Covered Person's initial office consultation would automatically trigger a series of internal practices and procedures in which the Prescribing No-fault Clinics, in exchange for kickbacks and/or other financial compensation agreements with Defendants, would prescribe Topical Pain Creams, Topical Pain Patches, and/or other select oral medications, including NSAIDs and muscle relaxers, pursuant to a standard, predetermined protocol regardless of whether such pharmaceuticals were medically necessary.

158.    Such Topical Pain Creams, Topical Pain Patches, and other select oral medications, including NSAIDs and muscle relaxers, were issued for virtually every Covered Person, regardless of factors such as their age, height, weight, prior medical history, position in the vehicle and/or purported involvement in an accident and without first trying commercially available alternative medications that are FDA-approved and available at significantly less cost.

159.    In fact, pursuant to the standard, predetermined protocol, the Covered Persons were routinely prescribed the Topical Pain Creams, Topical Pain Patches and/or other select oral medications, including NSAIDs and muscle relaxers, without the prescribing provider first taking a detailed patient history and without determining whether the Covered Person was currently taking any medications or suffering from any comorbidities.

160.   Pursuant to the standard, predetermined protocol, the Covered Persons were routinely prescribed the Topical Pain Creams, Topical Pain Patches, and/or other select oral medications, including NSAIDs and muscle relaxers, pursuant to regimented initial and follow-up examinations, which, on information and belief, were designed to justify continued, voluminous, and excessive use of prescribed pharmaceuticals.  The resulting examination reports rarely gave any indication as to why alternative FDA-approved and/or over-the-counter medications would not sufficiently address the Covered Person's condition.

161.   On information and belief, in furtherance of this predetermined protocol and in order to further facilitate the fraud set forth herein, Defendants entered into agreements with one or more of the Prescribing No-fault Clinics, Clinic Controllers and prescribing providers to utilize generic, boilerplate examination reports specifically designed to justify the continued and voluminous use of medically unnecessary Topical Pain Creams, Topical Pain Patches, and other select oral medications, including NSAIDS and muscle relaxers.

162.   By way of example and not limitation, in many instances, the generic, boilerplate examination reports were pre-printed and routinely stamped with one or more of the following predetermined medications, with preset options for strength and/or directions on how often to take or apply the medications prescribed, which the prescribing providers could select by circling the name and strength of the medication on the generic, preprinted, boilerplate examination report:

-Lidocaine 5% Ointment
-Celebrex 200 mg Oral Capsule
-Lidoderm 5% Patch
-Meloxicam 15 mg
-Diclofenac Sodium 3% Gel
-Naproxen 550 mg
-Nexium 20 mg
-Flexeril 5 mg

163. Exhibit "3" in the accompanying Compendium of Exhibits is a sampling of the generic, preprinted, boilerplate examination reports utilized by the No-fault Clinics, Clinic Controllers, and prescribing providers.

164. The Prescribing No-fault Clinics and Clinic Controllers would, in many instances, utilize generic, preprinted, boilerplate examination reports with preprinted medications designed to intentionally limit the pharmaceutical options available to Covered Persons to those which could reap Defendants the most profits, notwithstanding any perceived benefit or harm to Covered Persons.

165. Moreover, the reliance upon generic, preprinted, boilerplate examination reports by No-fault Clinics, Clinic Controllers and/or HCPs renders the prescriptions submitted by Defendants to Plaintiffs in violation of Section 910 of the Official Compilation of Codes, Rules and Regulations of the State of New York, which provides that:

> "[a] prescription shall be issued by a practitioner for legitimate medical purposes in good faith and in the course of his or her professional practice only. An order purporting to be a prescription that is not issued for legitimate medical purposes is not a prescription within the meaning of the New York State Education Law and the New York State Public Health Law and the person knowingly dispensing such an order, as well as the person issuing such order, shall be subject to all penalties provided in law or regulations." *See* 10 N.Y.C.R.R. § 910(2)(f).

166. On information and belief, at all times relevant herein, the Defendants knew or should have known that the pre-printed, boilerplate evaluation forms were bogus.

167. Irrespective of the needs of any individual Covered Person, the Prescribing No-fault Clinics prescribed the same pre-made, formulaic Topical Pain Creams, which contained the exact same amount of simple ingredients, including Diclofenac 3% gel and Lidocaine 5% ointment, and/or other pharmaceuticals to each and every Covered Person.

168.    On information and belief, as part of the kickback or other financial compensation agreement with the Prescribing No-fault Clinics and in furtherance of the scheme to defraud, on their first or second visit to the Prescribing No-fault Clinic(s), the Covered Persons would be given a number of documents to complete and sign, including, but not limited to, assignment of benefit forms in favor of Skillman Chemists, which, after execution, the prescribing No-fault Clinics would transmit to Skillman Chemists.

169.    In many if not all instances, the Prescribing No-fault Clinics never provided Covered Persons with the prescriptions for Topical Pain Cream to be filled at a pharmacy chosen by the Covered Persons. Rather, the Covered Persons were given the Topical Pain Creams at the Prescribing No-fault Clinics without even being given the prescription, or in some instances, being told that such medication was being prescribed, to eliminate the possibility that the Covered Person(s) would fill the prescription(s) with a legitimate pharmacy.

170.    On information and belief, the prescriptions for Topical Pain Creams and other select oral medications, including NSAIDs and muscle relaxers, were filled by Skillman Chemists as part of illicit and collusive arrangements whereby, in exchange for issuing such prescriptions, the referring No-fault Clinics, Clinic Controllers and/or HCPs received illegal payments from Defendants.

171.    At all times relevant herein, Skillman Chemists, as well as the No-fault Clinics, Clinic Controllers and prescribing providers, knew that there were effective, commercially available, FDA-approved and cheaper medications which would have been suitable to prescribe to Covered Persons, and that the Topical Pain Creams and/or other select oral medications, including NSAIDs and muscle relaxers, were being prescribed solely to enrich Defendants, the Prescribing No-fault Clinics and Clinic Controllers.

172.    In doing so, and as a result of Defendants' collusive agreements with Prescribing No-fault Clinics, Clinic Controllers and prescribing providers, Defendants promoted the sale of the Topical Pain Creams and other select oral medications over effective, commercially available, FDA-approved, cheaper alternatives, and thereby exercised undue influence over the Covered Persons in order to exploit the Covered Persons for their own financial gain.

173.    Demonstrative that the No-fault Clinics prescribed the Topical Pain Creams in order to exploit the patient for financial gain, irrespective of medical necessity and without regard to genuine patient care, in virtually, if not all instances, the Prescribing No-fault Clinics routinely:

- Failed to document in the Covered Persons' initial or follow-up evaluation reports on why the Topical Pain Cream was medically necessary;

- Failed to document a detailed medical history in Covered Persons' initial or follow-up evaluation reports, thereby failing to fully examine or document potential contraindications or comorbidities;

- Failed to document in Covered Persons' initial or follow-up evaluation reports on why commercially available over-the-counter, FDA approved medications could not be prescribed instead of the Topical Pain Cream; and

- Failed to document in Covered Persons' follow-up reports if the Topical Pain Cream was used by Covered Persons, and if so, was medically beneficial.

174.    Defendants engaged in the scheme to defraud alleged herein when they knew, or should have known, that substantially cheaper and commercially available FDA-approved medications proven to have therapeutic effects were available.

175.    The Topical Pain Creams, including in the form of Diclofenac 3% gel and Lidocaine 5% ointment, could have and should have been replaced with cheaper, over-the-counter, and readily available substitutes that have substantially similar, if not identical indications and effects.

176.    The Topical Pain Creams such as those dispensed by Skillman Chemists should be a final treatment option after oral medications and other commercially available, over-the-counter, FDA-approved topical creams are ineffective or not tolerated by patients.

**1.    Fraudulent Billing for Topical Lidocaine Pain Ointment**

177.    In order to facilitate the fraud set forth herein, Covered Persons at the Prescribing No-fault Clinics were routinely prescribed a particular Topical Pain Cream, in the form of topical Lidocaine 5% ointment, at voluminous rates and directed to have this prescription filled and dispensed (if at all) by Skillman Chemists, pursuant to Defendants' illicit, collusive arrangements with the Prescribing No-fault Clinics, Clinic Controllers and/or HCPs, in order to maximize profits, at the expense of genuine patient care, medical necessity or pharmacological outcome.

178.    Skillman Chemists rarely billed Plaintiffs for any formulation of topical Lidocaine other than Lidocaine 5% ointment. The fact that Lidocaine was routinely dispensed and billed by Skillman Chemists almost exclusively in this specific formulation demonstrates a lack of individualized patient care.

179.    Lidocaine is a local anesthetic used to relieve neuropathic pain of post-herpetic neuralgia, also referred to as after-shingles pain, and to relieve skin irritations such as minor burns, sunburn, abrasions of the skin, insect bites and hemorrhoids.

180.    According to *New York State Workers' Compensation Board, Non-Acute Pain Medical Treatment Guidelines, (First Edition, September 15, 2014, page 38;* August 25, 2021 Update, effective May 2, 2022, page 39), *New York State Workers' Compensation Board, Mid and Low Back Injury, (First Edition, September 15, 2014;* August 25, 2021 Update, effective May 2, 2022, page 38) and the *New York State Workers' Compensation Board, Neck Injury, (First Edition, September 15, 2014;* August 25, 2021 Update, effective May 2, 2022, page 34): **"**Topical lidocaine is only indicated when there is documentation of a diagnosis of neuropathic pain. In

this instance, a trial for a period of no greater than four weeks can be considered, with the need for documentation of functional gains as criteria for additional use."

181.    The prescribing providers routinely failed to document any functional deficit that could be managed by topical Lidocaine or a contraindication to use oral medications, demonstrating that the Lidocaine 5% ointment was routinely dispensed as part of an illegal kickback arrangement in furtherance of the scheme to defraud alleged herein.

182.    By way of example and not limitation, Lidocaine 5% ointment was prescribed to Covered Persons, dispensed by Skillman Chemists and billed to Plaintiffs for reimbursement in the following instances where the examination reports recorded no incidence of neuropathic pain or any functional deficit appropriate for the prescription:

- Covered Person E.F. (Claim No. 0643581234-02) was allegedly involved in a motor vehicle accident on September 6, 2021. Thereafter, E.F. presented for treatment at a No-fault Clinic located at 1650 Eastern Parkway, Brooklyn, New York, where E.F. purportedly underwent an initial examination by Cathy Delerme-Pagan, M.D. (not named a defendant in the Complaint) at 406 Medical P.C. (not named a Defendant in the Complaint) on September 15, 2021.  Even though 406 Medical P.C.'s report only contained diagnoses of sprains/strains of the thoracic and lumbar spine, and knee (i.e., no neuropathic pain), Lidocaine 5% Ointment was prescribed on September 15, 2021, and purportedly dispensed by Defendant Skillman Chemists on October 19, 2021.

- Covered Person M.P.P. (Claim No. 0703280883-01) was allegedly involved in a motor vehicle accident on January 12, 2023. Thereafter, M.P.P. presented for treatment at a No-fault Clinic located at 164-10 Crocheron Avenue, Flushing, New York, where M.P.P. purportedly underwent an initial examination by Colin Clarke, M.D. (not named a defendant in the Complaint) on February 13, 2023.  Even though Colin Clarke, M.D.'s report contained diagnoses of shoulder contusions, and cervical, thoracic, and lumbar spine strains/sprains (i.e., no neuropathic pain), Lidocaine 5% Ointment was prescribed on February 13, 2023, and purportedly dispensed by Defendant Skillman Chemists on February 15, 2023.

183.    Even if initial or follow-up evaluation reports by the prescribing provider listed any genuine patient need for lidocaine ointment, which it often did not, the reports routinely failed to

include any potential reason why prescription Lidocaine 5% ointment was medically necessary above and beyond a substantially similar and/or lower strength alternatives that were FDA-approved and commercially available at a fraction of the cost, such as Aspercreme, Icy Hot and Bengay.

184.    Skillman Chemists billed between $761.00 and $1,902.50 for a single tube of Lidocaine 5% ointment. However, over-the-counter alternatives, such as Aspercreme and Icy Hot, are commercially available at a retail cost of less than $20 and contain Lidocaine 4%.

185.    Despite this disparity in cost for a substantially similar product, on information and belief, Skillman Chemists regularly dispensed and billed for Lidocaine 5% ointment without any indication in the examination reports that the patient first tried any commercially available alternative, even for minor sprains.

186.    By way of example and not limitation, Skillman Chemists dispensed Lidocaine 5% ointment for Covered Persons and submitted bills to Plaintiffs for reimbursement even though the evaluation reports and/or other documentation in support of this billing demonstrated no medical necessity for Lidocaine 5% ointment instead of Lidocaine 4% ointment or any indication that the significantly cheaper, commercially available alternative was considered:

- Covered Person R.J. (Claim No. 0628928947-02) was allegedly involved in a motor vehicle accident on June 7, 2021. Thereafter, R.J. presented for treatment at a No-fault Clinic located at 92-08 Jamaica Avenue, Woodhaven, New York, where he purportedly underwent an initial examination by Lorraine Riotto, M.D. (not named a defendant in the Complaint) at Joseph A. Raia M.D. P.C. (not named a Defendant in the Complaint) on June 10, 2021, and, thereafter, follow-up examinations on July 15, 2021 and August 12, 2021.  Even though Joseph A. Raia M.D. P.C.'s reports made no mention of R.J. having first tried any lower dosage of Lidocaine ointment, Lidocaine 5% Ointment was prescribed on August 12, 2021, and dispensed by Defendant Skillman Chemists on September 27, 2021.

- Covered Person D.W. (Claim No. 0688160274-02) was allegedly involved in a motor vehicle accident on September 30, 2022. Thereafter, D.W. presented for treatment at a No-fault Clinic located at 513 Church Avenue, Brooklyn, New York, where he purportedly underwent an initial evaluation by Aleksandr Kopach, RPA-C (not named a defendant in the Complaint) of Atlantic Medical & Diagnostic, P.C. (not named a defendant in the Complaint) on October 3, 2022, and, thereafter, a follow-up examination on November 3, 2022.  Even though Atlantic Medical & Diagnostic, P.C.'s reports made no mention of D.W. having first tried any lower dosage of Lidocaine ointment, Lidocaine 5% Ointment was prescribed on November 4, 2022, and dispensed by Defendant Skillman Chemists on December 14, 2022.

- Covered Person A.A. (Claim No. 0703499557-02) was allegedly involved in a motor vehicle accident on February 20, 2023. Thereafter, A.A. presented for treatment at the No-fault Clinic located at 513 Church Avenue, Brooklyn, New York, where he purportedly underwent an initial evaluation by Aleksandr Kopach, RPA-C (not named a defendant in the Complaint) of Atlantic Medical & Diagnostic, P.C. (not named a defendant in the Complaint) on March 2, 2023. Even though Atlantic Medical & Diagnostic, P.C.'s examination report made no mention of A.A. having first tried any lower dosage of Lidocaine ointment, Lidocaine 5% Ointment was prescribed on March 5, 2023, and dispensed by Skillman Chemists on March 8, 2023, and April 27, 2023.

- Covered Person S.K. (Claim No. 0695545038-02) was allegedly involved in a motor vehicle accident on December 7, 2022. Thereafter, S.K. presented for treatment at the No-fault Clinic located at 513 Church Avenue, Brooklyn, New York, where he purportedly underwent an initial examination by Aleksandr Kopach, RPA-C (not named a defendant in the Complaint), of Atlantic Medical & Diagnostic, P.C. (not named a defendant in the Complaint) on December 15, 2022, and, thereafter, for follow-up examinations on January 16, 2023, February 13, 2023, and March 20, 2023. Even though Atlantic Medical & Diagnostic, P.C.'s reports made no mention of K.S. having first tried any lower dosage of Lidocaine ointment, Lidocaine 5% Ointment was prescribed on March 20, 2023, and dispensed by Defendant Skillman Chemists on March 22, 2023.

187.  Additionally, Skillman Chemists also routinely dispensed and billed Plaintiffs for reimbursement of Lidocaine 5% ointment despite the fact that it was prescribed concurrently with oral medications, such as NSAIDs and muscle relaxers, and/or concurrently with another Topical Pain Cream, such as Diclofenac 3% gel, in order to maximize profits without regard for patient care. By way of example and not limitation, Skillman Chemists submitted supporting

documentation to Plaintiffs for reimbursement of Lidocaine 5% ointment concurrently with other medications in the following instances:

- Covered Person W.V. (Claim No. 0657906442-01) was allegedly involved in a motor vehicle accident on January 17, 2022. Thereafter, W.V. presented at the No-fault Clinic located at 92-08 Jamaica Avenue, Woodhaven, New York, where she was purportedly examined by Eric Kenworthy, M.D. (not named a defendant in the Complaint) of Joseph A. Raia M.D. P.C. (not named a defendant in the Complaint) on February 3, 2023, and, thereafter, a follow-up examination on March 24, 2022. Skillman Chemists then billed Plaintiffs for allegedly dispensing Lidocaine 5% Ointment simultaneously with Naproxen 375 mg tablets, an oral NSAID, on February 23, 2022, and for allegedly dispensing Lidocaine 5% Ointment simultaneously with Naproxen 375 mg tablets and Cyclobenzaprine Hydrochloride 7.5 mg tablets, a muscle relaxer, on April 15, 2022, pursuant to prescriptions allegedly issued by Eric Kenworthy, M.D. on February 3, 2023.

- Covered Person A.R. (Claim No. 0703499557-03) was allegedly involved in a motor vehicle accident on February 20, 2023. Thereafter, A.R. presented for treatment at the No-fault Clinic located at 513 Church Avenue, Brooklyn, New York, where she purportedly examined by Aleksandr Kopach, RPA-C (not named a defendant in the Complaint), of Atlantic Medical & Diagnostic, P.C. (not named a defendant in the Complaint) on February 20, 2023. Skillman Chemists then billed Plaintiffs for allegedly dispensing Lidocaine 5% Ointment, simultaneously with Ibuprofen 800 mg tablets and Tizanidine Hydrochloride 4 mg capsules, a muscle relaxer, on March 7, 2023, April 21, 2023, and May 30, 2023, pursuant to prescriptions allegedly issued by Aleksandr Kopach, RPA-C on March 2, 2023, April 6, 2023 and May 8, 2023.

- Covered Person T.C. (Claim No. 0669944240-04 ) was allegedly involved in a motor vehicle accident on April 13, 2022.  Thereafter, T.C. presented at the No-fault Clinic located at 409 Rockaway Avenue, Brooklyn, New York, where he was purportedly examined by Cathy Delerme-Pagan, M.D. (not named a defendant in the Complaint) of Eastern Parkway Medical Health Services PC (not named a defendant in the Complaint) on April 21, 2022. Skillman Chemists then billed Plaintiffs for allegedly dispensing Lidocaine 5% Ointment, simultaneously with ibuprofen 800 mg tablets and methocarbamol 500 mg tablets, a muscle relaxer, on June 20, 2022, pursuant to prescriptions allegedly issued by Cathy Delerme-Pagan, M.D. on April 21, 2022.

- Covered Person A.H. (Claim No. 0645581596-11) was allegedly involved in a motor vehicle accident on October 17, 2021.  Thereafter, A.H. presented at the No-fault Clinic located at 1650 Eastern Parkway, Brooklyn, New York, where he was purportedly examined by Cathy Delerme-Pagan, M.D.

(not named a defendant in the Complaint) of 406 Medical P.C. (not named a defendant in the Complaint) on October 21, 2021. Skillman Chemists then billed Plaintiffs for allegedly dispensing Lidocaine 5% Ointment, simultaneously with ibuprofen 800 mg tablets, an oral NSAID, and methocarbamol 500 mg tablets, on December 28, 2021, pursuant to prescriptions allegedly issued by Cathy Delerme-Pagan, M.D. on October 21, 2021.

188.    Exhibit "4" in the accompanying Compendium of Exhibits is a spreadsheet listing representative sample of claims submitted by Skillman Chemists in which Skillman Chemists billed for simultaneously dispensing Lidocaine 5% Ointment with Diclofenac Sodium 3% gel, and/or an oral NSAID with or without an oral muscle relaxant.

189.    Furthermore, by way of example and not limitation, the Appendix to the Complaint, identifies a representative sample of predicate acts, including claim nos. 0703499557-04, 0703499557-03, 0692025448-01, 0697799079-01, 0688160274-03, and 0669944240-04, in which Skillman Chemists mailed fraudulent claims for simultaneously dispensing Lidocaine 5% ointment with Diclofenac Sodium 3% gel, and/or an oral NSAID with or without an oral muscle relaxant, that were supplied pursuant to the fraudulent protocol of treatment described herein, in exchange for kickbacks and/or other financial compensation agreements, for medically unnecessary pharmaceuticals in order to exploit and manipulate the payment formulas under the applicable Fee Schedule to maximize the charges that they could submit to Plaintiffs.

190.    Moreover, Lidocaine 5% ointment is not without risks or side effects, and the increased dosage at which the Prescribing No-fault Clinics and prescribing providers prescribed the Lidocaine increases the risk of the side effects associated with the medication.

191.    Excessive dosage or short intervals between doses of Lidocaine 5% Ointment can cause serious adverse effects including, among others, bradycardia, hypotension, and cardiovascular collapse that may lead to cardiac arrest.

192.     Patients should be instructed to strictly adhere to the recommended dosage and a single application of Lidocaine 5% Ointment should not exceed 5 grams, and no more than 20 grams of ointment should be used in a single day. However, any maximum dosage was virtually never included on the prescriptions purportedly filled by Skillman Chemists, which instead, routinely instructed patients to apply 2-3 times per day to the affected area, as needed.

193.     By engaging in a fraudulent scheme whereby Lidocaine 5% ointment was routinely prescribed without medical necessity, instead of (and without first prescribing) lower-strength, FDA-approved commercially available products, and without indication on the prescriptions as to safe dosage, Defendants placed their financial gain above genuine patient care and demonstrated a gross indifference to a patient's health and safety.

194.     Skillman Chemists was not and is not entitled to any reimbursement from Plaintiffs for the Lidocaine 5% ointment.

195.     The bills mailed by Skillman Chemists were fraudulent in that they misrepresented that (i) the Lidocaine 5% ointment were medically necessary when in fact they were not; (ii) they were provided pursuant to legitimate prescriptions when in fact they were not; and (iii) they were prescribed by legitimate medical providers when in fact they were provided pursuant to illegal kickback and/or financial compensation arrangements with No-Fault Clinics. In these and numerous other ways alleged herein, the Defendants designed and executed a fraudulent blueprint to bill and obtain payments from Plaintiffs for expensive Lidocaine 5% ointment that they were not entitled to receive under the No-fault law and implementing regulations.

196.     Defendants' activities described herein with respect to the Lidocaine 5% ointment promoted and facilitated other acts that imposed foreseeable costs onto Plaintiffs well beyond the insurance proceeds that Defendants collected, including, but not limited to, Plaintiffs' expenditures

for verifying each fraudulent claim through examinations under oath, associated attorneys' and court reporting fees, IMEs, and peer reviews.

**2.      Fraudulent Billing for Topical Diclofenac Gel**

197.      In order to facilitate the fraud set forth herein, Covered Persons at the Prescribing No-fault Clinics were routinely prescribed another particular Topical Pain Cream, in the form of topical Diclofenac Sodium 3% gel, at voluminous rates and directed to have this prescription filled and dispensed by Skillman Chemists, pursuant to Defendants' illicit, collusive arrangements with the Prescribing No-fault Clinics, Clinic Controllers and/or HCPs, in order to maximize profits, at the expense of genuine patient care, medical necessity or pharmacological outcome.

198.      Skillman Chemists rarely billed Plaintiffs for any formulation of topical Diclofenac other than Diclofenac Sodium 3% gel. The fact that Diclofenac was routinely dispensed and billed by Skillman Chemists almost exclusively in this specific formulation demonstrates a lack of individualized patient care.

199.      Diclofenac gel or cream is a topical NSAID that is commonly used to treat osteoarthritis and skin irritations such as actinic keratosis ("AK"), a type of warty skin growth.

200.      Notwithstanding any potential application of lower dosage pain patches and topical applications of Diclofenac Sodium available over-the-counter, and ignored by the Prescribing No-fault Clinics, Diclofenac Sodium 3% gel does not have any proven efficacy or safety in the treatment of musculoskeletal injuries such as sprains or strains, and such application of Diclofenac Sodium 3% Gel is not an accepted off-label use.

201.      Even if initial or follow-up evaluation reports by the prescribing provider listed any genuine patient need for Diclofenac, which it often did not, the reports routinely failed to include any potential reason why Diclofenac Sodium 3% gel was medically necessary above and beyond a substantially similar and/or lower strength alternatives that were FDA-approved and

commercially available at a fraction of the cost. Exhibit "5" in the Compendium of Exhibits is a spreadsheet listing representative sample of claims submitted by Skillman Chemists in which Skillman Chemists billed for Diclofenac Sodium 3% gel where the initial or follow-up examination report corresponding to the prescription purportedly filled by Skillman Chemists did not include any indication that a lower strength alternative was attempted but failed during a conservative course of treatment and failed to include any other potential reason why Diclofenac Sodium 3% gel was medically necessary above and beyond a substantially similar lower strength commercially available over-the-counter alternative. Furthermore, by way of example and not limitation, the Appendix to the Complaint, identifies a representative sample of predicate acts, including claim nos.0673443081-01 and 0679016774-02,  in which Skillman Chemists mailed fraudulent claims for Diclofenac Sodium 3% gel, that were supplied pursuant to the fraudulent protocol of treatment described herein, in exchange for kickbacks and/or other financial compensation agreements, for medically unnecessary pharmaceuticals in order to exploit and manipulate the payment formulas under the applicable Fee Schedule to maximize the charges that they could submit to Plaintiffs.

202.    By engaging in a fraudulent scheme whereby Diclofenac Sodium 3% gel was routinely prescribed without medical necessity, instead of (and without first prescribing) lower-strength, FDA-approved commercially available products, Defendants placed their financial gain above genuine patient care and demonstrated a gross indifference to a patient's health and safety.

203.    Skillman Chemists billed $1,180.00 to $2,360.00 for a single tube of Diclofenac Sodium 3% gel.

204.    Diclofenac Sodium is not without risks or side effects, and the increased dosage at which the Prescribing No-fault Clinics and prescribing providers prescribed the Diclofenac increases the risk of the side effects associated with the medication.

205.     The major risks associated with Diclofenac Sodium 3% gel include heart and blood vessel issues, including heart disease, heart attack and stroke, as well as severe stomach and bowel issues, including ulcers, intestinal bleeding, or perforation. The associated risks are high in those with pre-existing cardiovascular and gastrointestinal issues.  The risks are also greater with higher doses and long-term use.

206.     In fact, the United States Food and Drug Administration ("FDA") requires a "Black Box" warning for topical Diclofenac, which the FDA imposes when a drug carries a serious safety risk.  For topical Diclofenac, the "Black Box" warning lists the risks of serious cardiovascular and gastrointestinal events, which can be fatal.

207.     Furthermore, topical Diclofenac is classified as a NSAID and prescribing it concurrently with other oral NSAIDs, such as ibuprofen, naproxen, and/or meloxicam, could result in an increased risk of adverse events, such as hemorrhage, or a higher rate of gastrointestinal toxicity.  FDA product labels for over-the-counter brands of a lower dosage of topical Diclofenac contain warnings to this effect and generally recommend against concomitant use.

208.     By way of example and not limitation, Defendants' fraudulent scheme set forth herein resulted in therapeutic duplication with Diclofenac being prescribed concurrently with oral NSAIDs in the following occasions:

- Covered Person E.H. (Claim No. 0682562921-01) was allegedly involved in a motor vehicle accident on August 26, 2022. Thereafter, E.H. presented at the No-fault Clinic located at 513 Church Avenue, Brooklyn, New York, where he was purportedly examined by Aleksandr Kopach, RPA-C (not named a defendant in the Complaint) of Atlantic Medical & Diagnostic, P.C. (not named a defendant in the Complaint) on September 8, 2022.  Skillman Chemists then billed Plaintiffs for allegedly dispensing Diclofenac Sodium 3% gel simultaneously with Meloxicam 15 mg tablets, an oral NSAID, on November 14, 2022, pursuant to prescriptions allegedly issued by Aleksandr Kopach, RPA-C on November 1, 2022.

- Covered Person F.L. (Claim No. 0665514022-04) was allegedly involved in a motor vehicle accident on April 9, 2022. Thereafter, F.L. presented at the No-fault Clinic located at 480 East Jericho Turnpike, Huntington Station, New York, where she was purportedly examined by Olga Gibbons, M.D. (not named a defendant in the Complaint) of J.R. Medical PC (not named a defendant in the Complaint) on May 2, 2022.  Skillman Chemists then billed Plaintiffs for allegedly dispensing Diclofenac Sodium 3% gel simultaneously with Naproxen Sodium 375 mg tablets, an oral NSAID, on May 6, 2022, pursuant to prescriptions allegedly issued by Olga Gibbons, M.D. on April 9, 2022.

- Covered Person S.M. (Claim No. 0679016774-02) was allegedly involved in a motor vehicle accident on July 17, 2022. Thereafter, S.M. presented at the No-fault Clinic located at 1400 Fifth Avenue, Suite 3E, New York, New York, where he was purportedly examined by Dr. Conrad F. Cean (not named a defendant in the Complaint) of Conrad F. Cean MD, PLLC (not named a defendant in the Complaint) on September 1, 2022, and, thereafter, a follow-up examination on October 11, 2022. Skillman Chemists then billed Plaintiffs for allegedly dispensing Diclofenac Sodium 3% gel, simultaneously with Naproxen 500 mg tablets, an oral NSAID, on September 13, 2022, pursuant to prescriptions allegedly issued by Dr. Conrad F. Cean on October 11, 2022.

209.    Exhibit "6" in the accompanying Compendium of Exhibits is a spreadsheet listing representative sample of claims submitted by Skillman Chemists in which Skillman Chemists billed for simultaneously dispensing Diclofenac Sodium 3% gel with an oral NSAID.

210.    Furthermore, by way of example and not limitation, the Appendix to the Complaint, identifies a representative sample of predicate acts, including claim nos. 0692025448-01, 0679016774-14, and 0679016774-02 in which Skillman Chemists mailed fraudulent claims for Diclofenac Sodium 3% gel, that were supplied pursuant to the fraudulent protocol of treatment described herein, in exchange for kickbacks and/or other financial compensation agreements, for medically unnecessary pharmaceuticals in order to exploit and manipulate the payment formulas under the applicable Fee Schedule to maximize the charges that they could submit to Plaintiffs.

211.    On information and belief, Defendants' illegal, collusive arrangements with the No-fault Clinics, Clinic Controller and/or HCPs, which caused Diclofenac Sodium 3% gel to be

prescribed to Covered Persons at excessive amounts without individualized care, was profit-driven and demonstrated a genuine disregard for the patients' health and safety.

212.    Skillman Chemists was not and is not entitled to any reimbursement from Plaintiffs for Diclofenac Sodium 3% gel.

213.    The bills mailed by Skillman Chemists were fraudulent in that they misrepresented that (i) the Diclofenac Sodium 3% gel were medically necessary when in fact they were not; (ii) they were provided pursuant to legitimate prescriptions when in fact they were not; and (iii) they were prescribed by legitimate medical providers when in fact they were provided pursuant to illegal kickback and/or financial compensation arrangements with No-Fault Clinics. In these and numerous other ways alleged herein, the Defendants designed and executed a fraudulent blueprint to bill and obtain payments from Plaintiffs for expensive Diclofenac Sodium 3% gel that they were not entitled to receive under the No-fault law and implementing regulations.

214.    Defendants' activities described herein with respect to Diclofenac Sodium 3% gel promoted and facilitated other acts that imposed foreseeable costs onto Plaintiffs, including, but not limited to, Plaintiffs' expenditures for verifying each fraudulent claim through examinations under oath, associated attorneys' and court reporting fees, IMEs, and peer reviews.

**3.      Fraudulent Billing for Non-FDA Approved Topical Pain Patches**

215.    In addition to the foregoing billing for Topical Pain Creams, in order to facilitate the fraud set forth herein, Covered Persons at the Prescribing No-fault Clinics were routinely prescribed Topical Pain Patches, in the form of Lidothol patches, or their generic equivalent, Lidocaine 4.5%-Menthol 5% transdermal patches ("Lidothol patches"), a non-FDA approved drug, at voluminous rates and directed to have this prescription filled and dispensed by Skillman Chemists, pursuant to Defendants' illicit, collusive arrangements with the Prescribing No-fault

Clinics, Clinic Controllers and/or HCPs, in order to maximize profits, at the expense of genuine patient care, medical necessity or pharmacological outcome.

216.    The United Stated Federal Food, Drug, and Cosmetic Act ("FDCA") authorizes the FDA to oversee the safety of food, drugs, and cosmetics.

217.    The FDA strictly regulates over-the-counter and prescription drugs, and oversees drug manufacturing in several ways, including testing drugs and routinely inspecting drug manufacturing plants and outsourcing facilities engaged in the compounding of drugs.

218.    Federal law requires all new drugs in the United States be shown to be safe and effective for their intended use prior to marketing.  According to the FDA, unapproved drugs pose significant risks to patients because they have not been reviewed by the FDA for safety, effectiveness, or quality.  Without FDA review, there is no way to know if these drugs are safe and effective for their intended use, manufactured in a way that endures consistent drug quality, or whether their label is complete and accurate.

219.    The FDA considers Lidothol patches to be an unapproved drug.

220.    Unapproved prescription drugs are only allowed to be marketed in limited circumstances, such as if the drug is subject to an open drug efficacy study or if health care professionals rely on the drug to treat serious medical conditions where there is no FDA-approved drug to treat the condition.  No exception applies to Lidothol patches that may allow them to be marketed as prescription drug products.

221.    Accordingly, on information and belief, no legitimate pharmacy owner would purchase and dispense as prescription drugs large volumes of unapproved drugs, like Lidothol patches, not reviewed by the FDA.

222.     Similarly, on information and belief, no legitimate physician or healthcare provider would issue prescriptions for unapproved drugs like Lidothol patches, particularly since there are numerous other FDA-approved drugs available that the physician or healthcare provider could prescribe without any extraordinary risk to the patient.

223.     Notwithstanding the foregoing, Skillman Chemists routinely billed Plaintiffs dispensing Lidothol patches despite the availability of FDA-approved alternatives.

224.     In short, the Defendants obtained prescriptions and dispensed and billed for "unapproved" drugs through Skillman Chemists without any way to know if the drugs are safe and effective, manufactured in a way that ensured consistent drug quality, or contained complete and accurate labelling –solely to exploit the patients for financial gain, without regard for genuine patient care.

225.     By engaging in a fraudulent scheme whereby Lidothol patches were routinely prescribed without medical necessity or FDA approval, instead of (and without first prescribing) lower-strength, commercially available products, Defendants placed their financial gain above genuine patient care and demonstrated a gross indifference to a patient's health and safety.

226.     Moreover, as with the prescription of Lidocaine 5% ointment described above, the prescribing providers routinely failed to document any functional deficit that could be managed by topical Lidocaine or a contraindication to use oral medications, demonstrating that the Topical Pain Patches were routinely dispensed as part of an illegal kickback arrangement in furtherance of the scheme to defraud alleged herein.

227.     By way of example and not limitation, Covered Person M.W. (Claim No. 0666874557-01) was allegedly involved in a motor vehicle accident on April 16, 2022. Thereafter, M.W. presented for treatment at a No-fault Clinic located at 164-10 Crocheron Avenue, Flushing,

New York, where M.W. purportedly underwent an initial examination by Dr. Colin Clarke (not named a defendant in the Complaint) on April 25, 2022, and thereafter, follow-up examinations on June 6, 2022, June 20, 2022, August 22, 2022, September 26, 2022, and November 14, 2022.  Even though Dr. Colin Clarke's reports contained diagnoses of shoulder, hip, knee, and elbow contusions, thoracic strains/sprains, shoulder and knee derangement, concussion and lumbar discopathy, (i.e. no neuropathic pain), a transdermal pain patch containing Lidocaine 4.5% was prescribed on November 15, 2022, and purportedly dispensed by Defendant Skillman Chemists on November 18, 2022.

228.    Even if initial or follow-up evaluation reports by the prescribing provider listed any genuine patient need for a pain patch containing Lidocaine, which it often did not, the reports routinely failed to include any potential reason why prescription Lidothol (Lidocaine 4.5%-Menthol 5%) patches were medically necessary above and beyond a substantially similar and/or lower strength alternatives, commercially available at a fraction of the cost, such as generic Lidocaine 4%-Menthol 1% patches such as Walgreens' Cool n' Heat Patch, or Icy Hot: Max brand patches.

229.    Skillman Chemists routinely billed between $2,413.00 and $2,622.58 to fill a single prescription of 60 Lidothol patches. However, over-the-counter alternatives, such as Walgreens' Cool n' Heat Patch, are commercially available at a retail cost of less than $120 for 60 patches and contain Lidocaine 4%-Menthol 1%.

230.    Despite this disparity in cost for a substantially similar product, on information and belief, Skillman Chemists regularly dispensed and billed for Lidothol patches without any indication in the examination reports that the patient first tried any commercially available alternative, even for minor sprains.

231.    By way of example and not limitation, Covered Person Z.G. (Claim No. 0697766855-06) was allegedly involved in a motor vehicle accident on December 18, 2022. Thereafter, Z.G. presented for treatment at a No-fault Clinic located at 513 Church Avenue, Brooklyn, New York, where he purportedly underwent an initial examination by Aleksandr Kopach, RPA-C (not named a defendant in the Complaint) at Atlantic Medical & Diagnostic, P.C. (not named a Defendant in the Complaint) on December 29, 2022, and thereafter, follow-up examinations on, January 30, 2023, March 27, 2023, and May 4, 2023.  Even though Atlantic Medical & Diagnostic, P.C.'s reports made no mention of Z.G. having first tried any lower dosage of Lidocaine, Lidothol Patches were prescribed on March 27, 2023, and dispensed by Defendant Skillman Chemists on May 3, 2023.

232.    Skillman Chemists was not and is not entitled to any reimbursement from Plaintiffs for the Lidothol patches and/or generic Lidocaine 4.5%-Menthol 5% transdermal patches.

233.    The bills mailed by Skillman Chemists were fraudulent in that they misrepresented that (i) the Lidothol patches and/or generic Lidocaine 4.5%-Menthol 5% transdermal patches  were medically necessary when in fact they were not; (ii) they were provided pursuant to legitimate prescriptions when in fact they were not; and (iii) they were prescribed by legitimate medical providers when in fact they were provided pursuant to illegal kickback and/or financial compensation arrangements with No-Fault Clinics. In these and numerous other ways alleged herein, the Defendants designed and executed a fraudulent blueprint to bill and obtain payments from Plaintiffs for expensive Lidothol patches and/or generic Lidocaine 4.5%-Menthol 5% transdermal patches that they were not entitled to receive under the No-fault law and implementing regulations.

234.    Defendants' activities described herein with respect to the Lidothol patches and/or generic Lidocaine 4.5%-Menthol 5% transdermal patches promoted and facilitated other acts that imposed foreseeable costs onto Plaintiffs well beyond the insurance proceeds that Defendants collected, including, but not limited to, Plaintiffs' expenditures for verifying each fraudulent claim through examinations under oath, associated attorneys' and court reporting fees, IMEs, and peer reviews.

**4.     Defendants' Fraudulent Pharmaceuticals Scheme was Designed to Maximize Their Financial Gain**

235.    Defendants targeted Diclofenac Sodium 3% gel, Lidocaine 5% ointment and Lidothol patches to be part of the Fraudulent Pharmaceuticals routinely prescribed pursuant to the fraudulent scheme set forth herein because Skillman Chemists could readily purchase topical pain medications at a low cost but bill them out at egregiously high wholesale prices based on the Pharmacy Fee Schedule.

236.    Pursuant to the Pharmacy Fee Schedule governing topical pain medications, Skillman Chemists was entitled to the average wholesale price (AWP) minus 12% (for brand name drugs) or 20% (for generic drugs) for each ingredient within the cream, together with a nominal dispensing fee.

237.    In connection with Skillman Chemists' request for reimbursement from Plaintiffs, Skillman Chemists typically submitted an NF-3 form, which included the purported NDC numbers and corresponding charges for each drug product dispensed.

238.    The NDC numbers listed on the NF-3 form submitted by Skillman Chemists are what identified the purported AWPs for each of the Fraudulent Pharmaceuticals that Skillman Chemists purported to dispense.

239.     Defendants  never  submitted  wholesale  purchase  invoices  to  Plaintiffs demonstrating  how  much  Skillman  Chemists  actually  paid  the  suppliers  for  Fraudulent Pharmaceuticals, or whether Skillman Chemists actually purchased the pharmaceuticals with the NDC numbers listed in the billing submissions.

240.     On information and belief, the illegal kickback and referral arrangements Defendants entered into with Prescribing No-fault Clinics, Clinic Controllers and HCPs targeting these specific Fraudulent Pharmaceuticals, was motivated by profit maximization rather than genuine patient care.

241.     Defendants'  activities  described  herein  with  respect  to  the  Fraudulent Pharmaceuticals, which were prescribed pursuant to a fraudulent scheme and pursuant to illegal, collusive kickback arrangements, promoted and facilitated other acts that imposed foreseeable costs onto Plaintiffs, including, but not limited to, Plaintiffs' expenditures for verifying each fraudulent claim through examinations under oath, associated attorneys' and court reporting fees, IMEs, and peer reviews.

## DME AND ORTHOTIC DEVICE SCHEME TO DEFRAUD

242.     Separate and apart from the billing for Fraudulent Pharmaceuticals, Khaimov, through Skillman Chemists, engaged in a scheme to defraud, wherein Khaimov: (i) paid kickbacks to the No-fault Clinics in exchange for prescriptions of DME and/or orthotic devices; (ii) obtained prescriptions that were provided pursuant to a predetermined course of treatment, without regard to  medical  necessity;  (iii)  obtained  and  submitted  to  insurers,  in  general,  and  Plaintiffs,  in particular, prescriptions which they knew to be intentionally generic in order to misrepresent the number and/or quality of DME and/or orthotic devices actually prescribed; (iv) arranged for the No-fault Clinics to have assignments of benefits and acknowledgement of delivery receipt forms

signed by Covered Persons on their behalf to ensure that they had all of the documents necessary to submit claims to insurers, in general, and Plaintiffs, in particular; and (v) systematically submitted bills to insurers, in general, and Plaintiffs, in particular, for DME and/or orthotic devices that were purportedly provided to Covered Persons based on medical necessity when, in fact, Khaimov, through Skillman Chemists, determined the DME that would be prescribed by the No-fault Clinics, with virtually every Covered Person receiving a substantially similar battery of DME and/or orthotic devices.

243.    With Skillman Chemists in place, Defendants carried out their scheme to fraudulently bill insurers, in general, and Plaintiffs, in particular, for expensive DME and/or orthotic devices that were never provided, or if provided, were provided pursuant to fraudulent prescriptions based upon a pre-determined treatment protocol, irrespective of medical necessity, and further, were inexpensive items of inferior quality that cost a fraction of the amounts that Defendants materially misrepresented in their fraudulent bill submissions to Plaintiffs.

244.    Regardless of whether a Covered Person was seen by a doctor on the date of the initial office visit at any of the unnamed No-fault Clinics operating in the New York metropolitan area, a Covered Person's initial office consultation would automatically trigger a series of internal practices and procedures in which the No-fault Clinics, in exchange for kickbacks and/or other financial compensation agreements with Skillman Chemists, would issue a prescription for a standard battery of DME and/or orthotic devices, pursuant to a standard protocol or predetermined course of treatment and regardless of whether such items were medically necessary.

245.    Such prescriptions are issued for virtually every Covered Person, regardless of factors such as their age, height, weight, prior medical history, position in the vehicle and/or purported involvement in an accident.

246.     As part of the scheme to defraud described herein, pursuant to kickbacks or other financial compensation agreements with Skillman Chemists, the No-fault Clinics arranged for the fraudulent prescriptions to be issued to Skillman Chemists by: (i) causing their Health Care Practitioners ("HCPs") to write DME prescriptions in accordance with a pre-determined protocol; (ii) ensuring that the prescriptions were sufficiently generic so that the nature, quality and cost of any DME and/or orthotic device could not be verified based on the description of the prescribed item alone; and/or (iii) ensuring that the prescriptions were provided directly to Skillman Chemists to ensure that Skillman Chemists could bill Plaintiffs to purportedly fill the prescription rather than allow the possibility that the Covered Person may fill the prescription at a DME retailer of their own choosing.

247.     In numerous instances, not only did Covered Persons receive the same or similar battery of DME and/or orthotic devices, but oftentimes two or more Covered Persons that were purportedly injured in the same accident would receive identical or virtually identical prescriptions for DME and/or orthotic devices despite being different ages, in different physical condition, differently positioned in the same motor vehicle accident, and possessing differing medical needs.

248.     On information and belief, it is improbable that two or more Covered Persons in the same motor vehicle accident would suffer substantially similar injuries, be in similar physical health and/or have similar symptoms that would require identical or virtually identical DME and/or orthotic devices, let alone multiple Covered Persons.

249.     In furtherance of the scheme to defraud alleged herein, pursuant to the fraudulent protocol of treatment, the HCPs at the No-fault Clinics routinely prescribed identical DME and/or orthotic devices to two or more Covered Persons who were involved in the same accident.  By way of example and not limitation:

- On November 3, 2021, Covered Persons K.N., claim no. 0649232824-06 and S.S.M., claim no. 0649232824-08 were involved in the same automobile accident, but were in different physical conditions and experienced the impact from different locations in the vehicle, yet received the same DME and/or orthotic devices despite their injuries being almost certainly different:

| Covered Person | Date of Service | DME Billed For | Billing Code | Amount Billed |
|---|---|---|---|---|
| K.N. | 1/5/2022 | 1. Positioning cervical pillow | E0190 | $22.04 |
| | | 2. Bed board spring | E0271 | $157.21 |
| | | 3. Rubber foam Mattress | E0272 | $155.52 |
| | | 4. Back cushion wide | E2611 | $282.40 |
| | | 5. Cervical collar 2 piece pre OTS | L0174 | $255.03 |
| | | 6. Lumbar sacral orthosis pre OTS | L0642 | $398.36 |
| S.S.M. | 1/5/2022 | 1. Positioning cervical pillow | E0190 | $22.04 |
| | | 2. Bed board spring | E0271 | $157.21 |
| | | 3. Rubber foam Mattress | E0272 | $155.52 |
| | | 4. Back cushion wide | E2611 | $282.40 |
| | | 5. Cervical collar 2 piece pre OTS | L0174 | $255.03 |
| | | 6. Lumbar sacral orthosis pre OTS | L0642 | $398.36 |

- On June 8, 2021, Covered Persons C.D., claim no. 0629054347-01 and T.D., claim no. 0629054347-02 were involved in the same automobile accident, but were in different physical conditions and experienced the impact from different locations in the vehicle, yet received the same DME and/or orthotic devices despite their injuries being almost certainly different:

| Covered Person | Date of Service | DME Billed For | Billing Code | Amount Billed |
|---|---|---|---|---|
| C.D. | 7/19/2021 | 1. Positioning cervical pillow | E0190 | $22.04 |
| | | 2. Bed board spring | E0271 | $157.21 |
| | | 3. Rubber foam Mattress | E0272 | $155.52 |
| | | 4. Back cushion wide | E2611 | $282.40 |
| | | 5. Cervical collar 2 piece pre OTS | L0174 | $255.03 |
| | | 6. Lumbar sacral orthosis pre OTS | L0642 | $398.36 |
| | 8/2/2021 | 7. Infrared heating lamp with stand | E0205 | $296.27 |
| | | 8. Fitting conductive garment | E0731 | $254.21 |
| | | 9. EMS unit (four leads) | E0747 | $575.84 |
| | | 10. Cervical traction unit w/ pump | E0855 | $502.63 |
| | | 11. Deep tissue massager | E1399 | $267.51 |
| | | 12. Lumbar sacral orthosis CTM OTS | L0650 | $1,041.07 |
| | | 1. Positioning cervical pillow | E0190 | $22.04 |
| | | 2. Bedford spring | E0271 | $22.04 |
| | | 3. Rubber foam Mattress | E0272 | $157.21 |

| | | 4. Back cushion wide | E2611 | $155.52 |
|---|---|---|---|---|
| T.D. | 7/19/2021 | 5. Cervical collar 2 piece pre OTS | L0174 | $282.40 |
| | | 6. Lumbar sacral orthosis pre OTS | L0642 | $255.03 |
| | | 7. Infrared heating lamp with stand | E0205 | $398.36 |
| | | 8. Fitting conductive garment | E0731 | $296.27 |
| | | 9. EMS unit (four leads) | E0747 | $254.21 |
| | | 10. Cervical traction unit w/ pump | E0855 | $575.84 |
| | | 11. Deep tissue massager | E1399 | $502.63 |
| | | 12. Lumbar sacral orthosis CTM OTS | L0650 | $267.51 |

250. In furtherance of the predetermined fraudulent protocol of treatment, in numerous instances, the DME and/or orthotic devices prescribed were not documented in the initial examination report or a follow-up examination report of the HCP at the No-fault Clinics where the Covered Persons were treated. To the extent that any of the medical records did identify the DME and/or orthotic devices purportedly prescribed, the records did not explain the medical necessity for the DME and/or orthotic devices, did not identity or reference all of the DME and/or orthotic devices listed on the prescriptions, and in some instances, identified DME and/or orthotic devices that was not included on the prescription issued by the HCPs. In addition, on many occasions, the prescriptions for DME and/or orthotic devices, the prescriptions purportedly issued by the HCPs were often issued on dates that the Covered Persons did not treat with the HCPs. By way of example and not limitation:

- On August 4, 2021, Covered Person N.F., claim no. 0635296865-01 purportedly presented for an initial examination at a No-fault Clinic located at 1650 Eastern Parkway, Brooklyn, New York, and, thereafter, for follow-up examinations on September 16, 2021 and November 11, 2021, yet the initial examination report and follow-up reports made no mention of any prescription or recommendation for DME and/or orthotic devices. Notwithstanding, Skillman Chemists submitted prescriptions dated August 4, 2021 and January 18, 2022, purportedly from the same HCP prescribing 13 pieces of DME, consisting of an infrared lamp, general use cushion (wide), lumbar sacral support, EMS unit four lead, T.E.N.S. belt, bed board, egg crate mattress, cervical collar, thermal moist heat pad and cervical pillow, and left shoulder support brace, as well as bills for the following seven pieces of DME:

| Covered Person | Prescription Date | DME Prescribed | Billing Code | Amount Billed |
|---|---|---|---|---|
| N.F. | 8/17/2021 | 1. EMS unit (four leads) | E0205 | $296.27 |
| | | 2. Fitting conductive garment | E0731 | $254.21 |
| | | 3. Infrared heating lamp with stand | E0747 | $575.84 |
| | | 4. Deep tissue massager | E1399 | $267.51 |
| | | 5. Positioning car seat for persons with special orthopedic needs | T5001 | $398.50 |
| | 10/18/2021 | 6. Cervical traction unit w/ pump | E0855 | $502.63 |
| | 3/14/2022 | 7. Shoulder hand orthosis CTM left | L3961 | $1,481.78 |

- On May 5, 2022, Covered Person M.K., claim no. 0668293772-02, purportedly presented for initial examinations at two No-fault Clinics located at 513 Church Avenue, Brooklyn, New York, and, thereafter, a follow-up examination on June 8, 2022, yet the initial examination reports and follow up report made no mention of any prescription or recommendation for DME and/or orthotic devices.  Notwithstanding, Skillman Chemists submitted bills with prescriptions dated June 8, 2022 and June 9, 2022, purportedly from the HCPs prescribing the following fraudulent equipment:

| Covered Person | Prescription Date | DME Prescribed | Billing Code | Amount Billed |
|---|---|---|---|---|
| M.K. | 6/8/2022 | 1. Infrared heating lamp with stand | E0205 | $296.27 |
| | | 2. Percussor electric massager | E0480 | $355.00 |
| | | 3. Fitting conductive garment | E0731 | $254.21 |
| | | 4. EMS unit (four leads) | E0747 | $675.84 |
| | 6/9/2022 | 5. Lumbar sacral orthosis CTM OTS | L0650 | $844.00 |

- On June 13, 2022, Covered Person G.S., claim no. 0673443081-01, purportedly presented for initial examinations at two No-fault Clinics located at 513 Church Avenue, Brooklyn, New York, yet the initial examination reports made no mention of any prescription or recommendation for DME and/or orthotic devices.  Notwithstanding, Skillman Chemists submitted bills with prescriptions dated June 24, 2022, purportedly from the HCPs prescribing the following fraudulent equipment:

| Covered Person | Prescription Date | DME Prescribed | Billing Code | Amount Billed |
|---|---|---|---|---|
| G.S. | 6/24/2022 | 1. Positioning cervical pillow | E0190 | $22.04 |
| | | 2. Electric heat pad | E0215 | $74.20 |
| | | 3. Bed board spring | E0271 | $157.21 |
| | | 4. Rubber foam mattress | E0272 | $155.52 |
| | | 5. Lumbar sacral orthosis pre OTS | L0642 | $398.36 |
| | | 6. Positioning car seat for persons with special orthopedic needs | T5001 | $598.50 |
| | | 7. Shoulder hand orthosis CTM right | L3961 | $1,481.78 |

251.    In furtherance of the fraudulent protocol of treatment, the specific DME and/or orthotic devices prescribed often contradicted the purported treatment plan of the HCPs.

252.    By way of example and not limitation, several Covered Persons were prescribed DME and/or orthotic devices that were designed to decrease and/or restrict the Covered Persons' mobility such as LSOs.  At the same time, the HCPs, were also prescribed physical therapy treatments designed to increase the Covered Persons' mobility. Representative claims where Covered Persons were provided with DME and/or orthotic device prescription designed to decrease mobility, while at the same time were actively receiving physical therapy treatments designed to promote mobility include: T.D., 0629054347-02; E.O., 0629738492-02; K.H., 0634635064-07; E.G., 0658989462-02; and S.J., 0674272430-05.

253.    On information and belief, the DME and/or orthotic devices restricting the Covered Persons movement completely contravenes the physical therapy treatments that the Covered Persons were also prescribed.

254.    In furtherance of the scheme to defraud alleged herein, the No-fault Clinics did not provide the Covered Persons directly with the prescriptions for DME and/or orthotic devices. Instead, these prescriptions were given directly to Skillman Chemists to eliminate the possibility

that the Covered Person(s) would fill the prescription(s) with a legitimate retailer of DME and/or orthotic devices.

255.    In addition to arranging for fraudulent prescriptions, in exchange for kickbacks and/or other financial compensation agreements with Skillman Chemists, one or more No-fault Clinics operating in the New York metropolitan area often directed their HCPs to prescribe DME and/or orthotic devices that are not included in the Fee Schedule, such as bed boards, cushions, infrared heat lamps, massagers, whirlpools; and ensured that the prescriptions issued were generic and non-descript, omitting any detailed description of the items to be supplied to the Covered Persons.

256.    Similarly, as part of the kickback and/or other financial compensation agreements with the No-fault Clinics, the No-fault Clinics routinely provided Skillman Chemists with generic, non-descript prescriptions for certain Fee Schedule Items, such as back braces, knee braces, shoulder braces, ankle braces, cervical traction units, cervical collars, and lumbar cushions, which Skillman Chemists then used to unilaterally determine the DME provided to Covered Persons in purported fulfillment of the generic prescriptions, in order to bill for the most expensive type of DME and/or orthotic device and maximize reimbursement from insurers, in general, and Plaintiffs, in particular.

257.    By submitting a generic, non-descript prescription, devoid of any detail, in support of their claims for reimbursement, Skillman Chemists was provided the means through which they misrepresented the nature, quality and cost of the DME and/or orthotic devices allegedly prescribed and provided to Covered Persons.

258.    Furthermore, as part of the kickback or other financial compensation agreements with the No-fault Clinics and in furtherance of the scheme to defraud, on their first or second visit

to the No-fault Clinic(s), the Covered Persons would be given a number of documents to complete and sign, including, but not limited to, assignment of benefit forms and one or more delivery receipts.

259.   In every instance, in furtherance of the scheme to defraud alleged herein, the delivery receipts describe the DME and/or orthotic devices in the same generic, non-descript manner as the prescriptions, and claim forms submitted by Skillman Chemists in support of its claims for reimbursement.

260.   In furtherance of the scheme to defraud alleged herein, the delivery receipts submitted by Skillman Chemists to Plaintiffs routinely misrepresented the DME and/or orthotic devices provided.

261.   In furtherance of the scheme to defraud alleged herein, Khaimov, through Skillman Chemists, purchased inexpensive DME and/or orthotic devices from wholesalers not named as defendants herein that were counterfeit or knockoffs of trademarked items made by other manufacturers. At all relevant times mentioned herein, Skillman Chemists knew that they could purchase the counterfeit items at a fraction of the cost of the actual, trademarked items.

262.   In furtherance of the scheme to defraud alleged herein, Skillman Chemists purchased the cheap DME and/or orthotic devices in bulk and routinely misrepresented the nature, quality, and cost of the items in order to fraudulently obtain and maximize their reimbursement far in excess of the amounts they were entitled to receive under the No-fault Law.

263.   In furtherance of the scheme to defraud alleged herein, Skillman Chemists routinely submitted fraudulent documents, including, but not limited to, claim forms, prescriptions, and delivery receipts, that materially misrepresented the nature, quality, and cost of the DME and/or orthotic devices purportedly provided to Covered Persons.

264.    In furtherance of the scheme to defraud alleged herein, Skillman Chemists routinely submitted fraudulent bills seeking the maximum possible amount of reimbursement under the No-fault Law for expensive DME and/or orthotic devices that were never actually provided or not provided as billed and/or, if provided, provided pursuant to a predetermined course of treatment, without regard to medical necessity.

265.    In many cases, Skillman Chemists never actually provided the DME for which it billed Plaintiffs.

266.    In furtherance of the scheme to defraud alleged herein, Skillman Chemists' bills intentionally omitted the make, model, and manufacturer of the DME and/or orthotic devices purportedly provided to Covered Persons in order to conceal the fact that the DME and/or orthotic devices purportedly provided were inexpensive and of poor quality, to the extent they were provided at all.

267.    By way of example and not limitation, and as set forth in the "Non-Fee Schedule Scheme to Defraud" section below, Khaimov, through Skillman Chemists, routinely submitted bills to Plaintiffs for Non-Fee Schedule items wherein Skillman Chemists misrepresented that: (i) certain DME and/or orthotic devices were reimbursable under the relevant Fee Schedule in existence at the time when, in fact, Skillman Chemists were utilizing phantom codes for which there was no published fee schedule; (ii) the charges reflected on Skillman Chemists' bills for Non-Fee Schedule items were the lesser of their acquisition costs or the usual and customary prices charged to the general public; and/or (iii) the Fee Schedule codes and descriptions contained in Skillman Chemists' bills corresponded with the equipment purportedly provided.

268.    In addition, as set forth in the "Fee Schedule Scheme to Defraud" section below, Khaimov, through Skillman Chemists, routinely submitted fraudulent bills to Plaintiffs (i) in

support of expensive custom-fabricated DME and/or orthotic devices, such as shoulder braces that were never provided; (ii) in support of expensive DME and/or orthotic devices that required a customized fitting that they never performed; and/or (iii) which sought reimbursement rates under expensive fee schedule codes for DME and/or orthotic devices that Skillman Chemists never actually provided.

269.    In furtherance of the scheme to defraud and to maximize reimbursement from Plaintiffs, virtually every bill submitted by Skillman Chemists deliberately obscured all identifying information relating to the billed-for DME and/or orthotic devices so as to prevent Plaintiffs from determining the appropriate charges associated with any such DME and/or orthotic device or whether the specific DME and/or orthotic device was medically necessary.

270.    Defendants' activity promoted and facilitated other acts that imposed costs onto Plaintiffs well beyond the insurance proceeds that Defendants collected, including, but not limited to, Plaintiffs' expenditures for verifying each fraudulent claim through examinations under oath, associated attorneys' and court reporting fees, independent medical examinations ("IMEs"), and peer reviews.

### *The Non-Fee Schedule Scheme to Defraud*

### 1.    Fraudulent Billing Under Phantom Codes Not Recognized in the Fee Schedule

271.    In furtherance of the scheme to defraud alleged herein, Khaimov, through Skillman Chemists, routinely submitted bills for Non-Fee Schedule items, wherein they misrepresented that those items were reimbursable under the Fee Schedule when, in fact, they were utilizing phantom codes for items that were not listed on the relevant Fee Schedule in existence at the time.

272.    By way of example and not limitation, Khaimov, through Skillman Chemists, routinely submitted bills to Plaintiffs for "Infrared Lamp" units using phantom code E0205, which

is not recognized in the Fee Schedule, in the amount of $296.27, notwithstanding that, to the extent any DME was provided, the devices purportedly provided were actually cheap, hand held heat lamps, reimbursable, if at all, as a Non-Fee Schedule item, for which the usual and customary price charged to the general public is, upon information and belief, no more than $40.00. Exhibit "7" in the accompanying Compendium of Exhibits is a representative sample of claims wherein Skillman Chemists submitted fraudulent bills for a heat lamp unit to one or more Plaintiffs, using a phantom code not recognized under the relevant Fee Schedule in existence at the time.

273.    Furthermore, by way of example and not limitation, the Appendix to the Complaint, identifies a representative sample of predicate acts, including claim nos. 0629367616-02, 0633507058-03, 0639639268-02, 0649346269-03, and 0650522055-03 in which Skillman Chemists mailed fraudulent claims for infrared lamps, that were supplied pursuant to the fraudulent protocol of treatment described herein, in exchange for kickbacks and/or other financial compensation agreements, for medically unnecessary DME in order to exploit and manipulate the payment formulas under the applicable Fee Schedule and No-fault Law to maximize the charges that they could submit to Plaintiffs.

274.    By billing under the phantom code for the heat lamp units, Khaimov, through Skillman Chemists, billed and were paid in excess of five times what they would otherwise have been entitled to receive, if anything, under the No-fault Law.

275.    By way of further example and not limitation, Khaimov, through Skillman Chemists, routinely submitted bills to Plaintiffs for "Fitting Conductive Garments" under billing code E0731 which was not recognized under the relevant Fee Schedule through April 3, 2022, in the amount of $274.21.

276. From April 4, 2022, through the present, E0731 was on the Fee Schedule and was reserved for "form fitting conductive garment for delivery of TENS or NMES (with conductive fibers separate from the patient's skin by layers of fabric)", with a maximum listed reimbursement amount of $71.05.

277. Notwithstanding the foregoing, to the extent any DME was provided, the belts were thin cloth wraps lacking electrode pads, reimbursable, if at all, as a Non-Fee Schedule item, for which the usual and customary price charged to the general public is, upon information and belief, no more than $20.00. Exhibit "8" in the accompanying Compendium of Exhibits is a representative sample of claims representative sample of claims wherein Skillman Chemists submitted fraudulent bills for Fitting Conductive Garments using HCPCS code E0731.

278. Furthermore, by way of example and not limitation, the Appendix to the Complaint, identifies a representative sample of predicate acts, including claim nos. 0629367616-02, 0633507058-03, 0639639268-02, 0649346269-03, and 0650522055-03 in which Skillman Chemists mailed fraudulent claims for TENS Belts, that were supplied pursuant to the fraudulent protocol of treatment described herein, in exchange for kickbacks and/or other financial compensation agreements, for medically unnecessary DME in order to exploit and manipulate the payment formulas under the applicable Fee Schedule and No-fault Law to maximize the charges that they could submit to Plaintiffs.

279. By submitting to Plaintiffs bills for Fitting Conductive Garments using HCPCS code E0731, Khaimov, through Skillman Chemists, deliberately misrepresented that their bills reflected either a reimbursement amount set by the Fee Schedule, or alternatively that their bills reflected the lesser of their acquisition cost plus 50%, or the usual and customary price for the public, when in reality, to the extent anything was provided, the items did not have a Fee Schedule

code and Khaimov, through Skillman Chemists, were entitled to receive only a fraction of the amount reflected in their bills.

280.    Consequently, by submitting to Plaintiffs bills that contained phantom codes not recognized under the relevant Fee Schedule in existence at the time, Khaimov, through Skillman Chemists, deliberately and materially misrepresented the amounts that they were entitled to receive and deceived Plaintiffs, among others, into paying many times over what the No-fault Law would have otherwise allowed for medically necessary DME and/or orthotic devices.

**2.     Fraudulent Billing Using Fee Schedule Miscellaneous Codes**

281.    In furtherance of the scheme to defraud alleged herein, Khaimov, through Skillman Chemists, routinely submitted bills for Non-Fee Schedule items using Fee Schedule code E1399 which is reserved for miscellaneous items, and in doing so, they fraudulently misrepresented the nature and quality of the billed-for DME and/or orthotic devices and their acquisition costs.

282.    By way of example and not limitation, Khaimov, through Skillman, routinely submitted bills to Plaintiffs for "deep tissue massagers" using code E1399, in the amount of $267.51, falsely representing that the amount billed is the lesser of the usual and customary price charged to the general public or Skillman Chemists' acquisition cost plus 50%, when, on information and belief, to the extent anything was provided, Skillman Chemists provided simple, hand held massagers for which the usual and customary price charged to the general public, upon information and belief, did not exceed $40.00.  Exhibit "9" in the accompanying Compendium of Exhibits is a representative sample of claims in which Skillman Chemists submitted fraudulent bills for massagers to Plaintiffs using Fee Schedule Code E1399. Furthermore, by way of example and not limitation, the Appendix to the Complaint, identifies a representative sample of predicate acts, including claim nos. 0633507058-03, 0639639268-02, and 0650522055-03 in which

Skillman Chemists mailed fraudulent claims for massagers, that were supplied pursuant to the fraudulent protocol of treatment described herein, in exchange for kickbacks and/or other financial compensation agreements, for medically unnecessary DME in order to exploit and manipulate the payment formulas under the applicable Fee Schedule and No-fault Law to maximize the charges that they could submit to Plaintiffs.

**3.      Fraudulent Billing for Non-Fee Schedule Items under Fee Schedule Codes**

283.     In furtherance of the scheme to defraud alleged herein, Khaimov, through Skillman Chemists, routinely submitted bills to Plaintiffs for Non-Fee Schedule Items using codes reserved for Fee Schedule Items in order to maximize the fraudulent charges they could submit to Plaintiffs, despite the fact that they never provided the billed-for items.

284.     By way of example and not limitation, Khaimov, through Skillman Chemists routinely submitted bills to Plaintiffs for a "Rubber foam mattress" Non-Fee Schedule Item which is nothing more than a thin, foam mattress *pad*, using the Fee Schedule code E0272, which is reimbursable in the maximum amount of $155.52.

285.     Skillman Chemists never provided a foam mattress to any Covered Persons.

286.     To the extent any DME and/or orthotic device was provided, Skillman Chemists provided simple bubble mattress pads, which it described as "Foam Mattress" for which the usual and customary price charged to the general public, upon information and belief, did not exceed $25.00.

287.     By submitting bills using code E0272, Khaimov, through Skillman Chemists, materially misrepresented that they provided foam mattresses, when they did not, and also materially misrepresented that the item purportedly provided was a Fee Schedule item, seeking reimbursement in amounts upwards of six times what would otherwise have been a permissible

charge for the Non-Fee Schedule item.  Exhibit "10" in the accompanying Compendium of Exhibits is a representative sample of claims in which Skillman Chemists submitted fraudulent bills for foam mattresses to Plaintiffs by billing for the Non-Fee Schedule DME under a Fee Schedule code. Furthermore, by way of example and not limitation, the Appendix to the Complaint, identifies a representative sample of predicate acts, including claim nos. 0629054347-02, 0634635064-07, 0634635064-08, 0639639268-02, 0640907895-02, 0646639468-02, 0647364058-01, 0650522055-03, 0658989462-02, and 0674272430-05, in which Skillman Chemists mailed fraudulent claims for bubble mattress pads that were not supplied as billed, supplied pursuant to the fraudulent protocol of treatment described herein, in exchange for kickbacks and/or other financial compensation agreements, for medically unnecessary DME in order to exploit and manipulate the payment formulas under the applicable Fee Schedule and No-fault Law to maximize the charges that they could submit to Plaintiffs.

288.     By way of further example and not limitation, Khaimov, through Skillman Chemists, routinely submitted bills to Plaintiffs for "bedboard [sic] springs," which are a Non-Fee Schedule item, using Fee Schedule code E0271, which is reserved for an inner spring mattress—an item that is customarily used in conjunction with a hospital bed—reimbursable in the maximum amount of $157.21.

289.     Skillman Chemists never provided an inner spring mattress to any Covered Persons.

290.     To the extent any DME and/or orthotic device was provided, Skillman Chemists provided inexpensive, thin pieces of foldable cardboard or other material, which it described as "bed boards," for which the usual and customary price charged to the general public, upon information and belief, did not exceed $40.00.

291.   By submitting bills using code E0271, Khaimov, through Skillman Chemists, materially misrepresented that they provided inner spring mattresses, when they did not, and also materially misrepresented that the item purportedly provided was a Fee Schedule item, seeking reimbursement in amounts more than three times what would otherwise have been a permissible charge for the Non-Fee Schedule item. Exhibit "11" in the accompanying Compendium of Exhibits is a representative sample of claims in which Skillman Chemists submitted fraudulent bills to Plaintiffs for bed boards by billing for the non-Fee Schedule DME under a Fee Schedule code. Furthermore, by way of example and not limitation, the Appendix to the Complaint, identifies a representative sample of predicate acts, including claim nos. 0629054347-02, 0634635064-07. 0639639268-02.   0640907895-02,   0646639468-02,   0647364058-01,   0650522055-03, 0658989462-02, and 0674272430-05, in which Skillman Chemists mailed fraudulent claims for bed boards that were not supplied as billed, supplied pursuant to the fraudulent protocol of treatment described herein, in exchange for kickbacks and/or other financial compensation agreements, for medically unnecessary DME in order to exploit and manipulate the payment formulas under the applicable Fee Schedule and No-fault Law to maximize the charges that they could submit to Plaintiffs.

292.   By way of further example and not limitation, Khaimov, through Skillman Chemists, routinely submitted bills to Plaintiffs for "orthopedic car seats," which is a Non-Fee Schedule item, using code T5001, which is reserved for a "Positioning seat for persons with special orthopedic needs," a Fee Schedule item reimbursable in the maximum amount of $756.03.

293.   On information and belief, Skillman Chemists never provided a positioning seat for persons with special orthopedic needs to any Covered Person.

294. On information and belief, to the extent any DME and/or orthotic device was provided, Skillman Chemists provided inexpensive, cheap bubble pads, which it described as "orthopedic car seats", for which the usual and customary price charged to the general public, upon information and belief, did not exceed $40.00.

295. By submitting bills using code T5001, Khaimov, through Skillman Chemists, materially misrepresented that they provided positioning seat for persons with special orthopedic needs, when they did not, also materially misrepresented that the item purportedly provided was a Fee Schedule item, seeking reimbursement in amounts more than ten times what would otherwise have been a permissible charge for the Non-Fee Schedule item. Exhibit "12" in the accompanying Compendium of Exhibits is a representative sample of claims where Skillman Chemists submitted fraudulent bills to Plaintiffs for positioning seats for persons with special orthopedic needs, by billing for the non-Fee Schedule DME under a Fee Schedule code. . Furthermore, by way of example and not limitation, the Appendix to the Complaint, identifies a representative sample of predicate acts, including claim nos. 0640907895-02, 0647364058-01, and 0658989462-02, in which Skillman Chemists mailed fraudulent claims for orthopedic car seats that were not supplied as billed, supplied pursuant to the fraudulent protocol of treatment described herein, in exchange for kickbacks and/or other financial compensation agreements, for medically unnecessary DME in order to exploit and manipulate the payment formulas under the applicable Fee Schedule and No-fault Law to maximize the charges that they could submit to Plaintiffs.

296. By way of further example and not limitation, Khaimov, through Skillman Chemists, routinely submitted bills to Plaintiffs for "EMS unit (four leads)" for $575.84, a Non-Fee Schedule Item which is nothing more than a cheap "digital therapy machine" using the Fee

Schedule code E0747, which is reserved for a "Osteogenesis stimulator electrical, noninvasive, other than spinal applications," reimbursable in the maximum amount of $3,300.00.

297.    On information and belief, Khaimov, through Skillman Chemists, never provided an EMS device, nor an osteogenesis stimulator to any Covered Person.

298.    To the extent any DME and/or orthotic device was provided, Skillman Chemists provided cheap digital therapy machines, which they described as "EMS unit (four leads)" for which the usual and customary price charged to the general public did not exceed $30.00.

299.    By submitting bills using codes E0747, Khaimov, through Skillman Chemists, materially misrepresented that they provided an osteogenesis stimulator, when they did not, and also materially misrepresented that the item purportedly provided was a Fee Schedule item, seeking reimbursement in amounts over nineteen times what would otherwise have been a permissible charge for the Non-Fee Schedule item.   Exhibit "13" in the accompanying Compendium of Exhibits is a representative sample of claims in which Skillman Chemists submitted fraudulent bills to Plaintiffs for EMS Units by billing for the Non-Fee Schedule DME under a Fee Schedule code. Furthermore, by way of example and not limitation, the Appendix to the Complaint, identifies a representative sample of predicate acts, including claim nos. 0629367616-02,    0632188223-01,    0633507058-01,    0633507058-03,    0639639268-02, 0649346269-03, and 0650522055-03, in which Skillman Chemists mailed fraudulent claims for EMS unit (four leads) that were not supplied as billed, supplied pursuant to the fraudulent protocol of treatment described herein, in exchange for kickbacks and/or other financial compensation agreements, for medically unnecessary DME in order to exploit and manipulate the payment formulas under the applicable Fee Schedule and No-fault Law to maximize the charges that they could submit to Plaintiffs.

300.    By way of further example and not limitation, Khaimov, through Skillman Chemists, routinely submitted bills to Plaintiffs for "percussor electric massagers," which is a Non-Fee Schedule item, using code E0480, which is reserved for a "Percussor, Electric or Pneumatic, Home Model," an intrapulmonary percussive ventilation device, a Fee Schedule item reimbursable in the maximum amount of $355.56.

301.    On information and belief, to the extent any DME and/or orthotic device was provided, Skillman Chemists provided simple, hand-held massagers for which the usual and customary price charged to the general public, upon information and belief, did not exceed $40.00.

302.    By submitting bills using code E0480, Khaimov, through Skillman Chemists, materially misrepresented that they provided an intrapulmonary percussive ventilation device, when they did not, and also materially misrepresented that the item purportedly provided was a Fee Schedule item, seeking reimbursement in amounts more than eight times the permissible charge for the Non-Fee Schedule item. Exhibit "14" in the accompanying Compendium of Exhibits is a representative sample of claims where Skillman Chemists submitted fraudulent bills for a Percussor, Electric or Pneumatic, Home Model to Plaintiffs by billing for the non-Fee Schedule DME under a Fee Schedule code. Furthermore, by way of example and not limitation, the Appendix to the Complaint, identifies a representative sample of predicate acts, including claim nos. 0629367616-02, and 0649346269-03, in which Skillman Chemists mailed fraudulent claims for percussor electric massagers that were not supplied as billed, supplied pursuant to the fraudulent protocol of treatment described herein, in exchange for kickbacks and/or other financial compensation agreements, for medically unnecessary DME in order to exploit and manipulate the payment formulas under the applicable Fee Schedule and No-fault Law to maximize the charges that they could submit to Plaintiffs.

### *The Fee Schedule Scheme to Defraud*

**1.      Fraudulent Billing for Custom Fabricated Orthotic Devices**

303.     The term "custom-made" and/or "custom-fabricated" as used in the New York State Medicaid Fee Schedule refers to any DME, orthopedic footwear, orthotics or prosthetics fabricated solely for a particular person from mainly raw materials that cannot be readily changed to conform to another person's needs. See, e.g., Durable Medical Equipment, Orthotics, Prosthetics and Supplies Policy Guidelines, New York State Department of Health (March 1, 2019), at 4.

304.     Raw materials are used to create custom-made DME, orthopedic footwear, orthotics or prosthetics based on a particular person's measurements, tracings, and patterns. *Id*.

305.     To bill under any Fee Schedule code reserved for custom-made DME and/or orthotic devices, a retailer is required to measure the recipient of the items and fabricate the custom-made item based on those measurements. *Id.*

306.     In furtherance of the scheme to defraud, Khaimov, through Skillman Chemists, routinely submitted fraudulent bills in support of expensive custom fabricated DME and/or orthotic devices, despite the fact that, to the extent anything was provided, the DME and/or orthotic devices were cheap, one-size-fits-all items that were not custom fabricated to the Covered Persons' measurements.

307.     Under the relevant Fee Schedule in existence at the time, the permissible charges for a shoulder support range from $40.00, under code L3650, for a prefabricated shoulder support dispensed off-the-shelf, to $1,534.67, under code L3967, for more complex custom fabricated DME and/or orthotic devices.

308.     In furtherance of the scheme to defraud, to ensure they received the maximum reimbursement permitted under the relevant Fee Schedule in existence at the time Khaimov,

through Skillman Chemists, routinely submitted bills for shoulder braces using code L3961, which is reserved for more complex custom fabricated DME and/or orthotic devices, notwithstanding that a custom fabricated device was not provided.  By way of example and not limitation, Exhibit "15" in the accompanying Compendium of Exhibits is a representative sample of claims where Skillman Chemists submitted fraudulent bills for shoulder supports to Plaintiffs using code L3961.

## 2.     Fraudulent Billing for Cervical Traction Units

309.    Skillman Chemists routinely submitted fraudulent bills to Plaintiffs for what it refers to as "cervical traction equipment" under Fee Schedule Code E0855.

310.    The cervical traction equipment purportedly provided by Skillman Chemists are inexpensive replicas or knockoffs of a trademarked cervical traction unit, with a wholesale price that is a fraction of the cost associated with the authentic device. In that regard, to the extent anything was supplied to Covered Persons at all, Skillman Chemists provided basic, inexpensive cervical traction units pursuant to a predetermined course of treatment, based on generic prescriptions, regardless of medical necessity and misrepresented the nature, quality, and cost of the items in each of the bills submitted to Plaintiffs.

311.    By billing for cervical traction units, it purportedly provided under code E0855, Khaimov, through Skillman Chemists, falsely represented that they provided expensive, medically necessary cervical traction units when in actuality they provided cheap, inexpensive items that in many cases were replicas or knockoffs of trademarked items.  By way of example and not limitation, Exhibit "16" in the accompanying Compendium of Exhibits is a representative sample of claims where Skillman Chemists submitted fraudulent bills for "cervical traction equipment" to Plaintiffs.  Furthermore, by way of example and not limitation, the Appendix to the Complaint, identifies a representative sample of predicate acts, including claim nos. 0626739502-07,

0633507058-01, 0634635064-08, 0639639268-02, 0647364058-01, 0650522055-03, 0658989462-02, and 0661402701-04, in which Skillman Chemists mailed fraudulent claims for cervical traction devices that were not supplied as billed, supplied pursuant to the fraudulent protocol of treatment described herein, in exchange for kickbacks and/or other financial compensation agreements, for medically unnecessary DME in order to exploit and manipulate the payment formulas under the applicable Fee Schedule and No-fault Law to maximize the charges that they could submit to Plaintiffs.

### 3.   Fraudulent Billing for DME and/or Orthotic Devices Not Provided

312.   In furtherance of the scheme to defraud alleged herein, Khaimov, through Skillman Chemists, routinely submitted bills to Plaintiffs for DME and/or orthotic devices that were never provided.

313.   By way of example and not limitation, Khaimov, through Skillman Chemists, routinely submitted fraudulent bills to Plaintiffs seeking reimbursement for lumbar cushions using codes E2611 and E2612 in the amounts of $282.40 and $382.02 respectively, which they did not provide as billed, if anything was provided at all.

314.   Under the relevant Fee Schedule in existence at the time, both codes E2611 and E2612 are reserved for DME satisfying the description of "General Use Wheelchair Back Cushion" and are specifically reserved for support used in connection with a wheelchair.

315.   On information and belief, none of the Covered Persons who purportedly received a lumbar cushion from Skillman Chemists, billed under codes E2611 an E2612, was wheelchair bound.

316.    To the extent any DME and/or orthotic device was provided, the lumbar cushions were not specialized wheelchair cushions, but rather simple back cushions for use in any chair that would otherwise be reimbursable under code E0190 at $22.04.

317.    By billing lumbar cushions under codes E2611 and E2612, Khaimov, through Skillman Chemists, falsely represented that they provided specialized wheelchair cushions and/or covers, when they did not.

318.    Exhibit "17" in the accompanying Compendium of Exhibits is a representative sample of claims where Skillman Chemists submitted fraudulent bills for lumbar cushions to Plaintiffs under codes E2611 and E2612.  Furthermore, by way of example and not limitation, the Appendix to the Complaint, identifies a representative sample of predicate acts, including claim nos. 0629054347-01, 0629054347-02, 0634635064-07, 0634635064-08, and 0674272430-05, in which Skillman Chemists mailed fraudulent claims for lumbar cushions  that were not supplied as billed, supplied pursuant to the fraudulent protocol of treatment described herein, in exchange for kickbacks and/or other financial compensation agreements, for medically unnecessary DME in order to exploit and manipulate the payment formulas under the applicable Fee Schedule and No-fault Law to maximize the charges that they could submit to Plaintiffs.

**4.    Fraudulent Over-Billing for Heating Pads**

319.    In furtherance of the scheme to defraud, Khaimov, through Skillman Chemists, routinely fraudulently billed for heating pads, far in excess of what was permissible under the Fee Schedule in effect at the time.

320.    In that regard, Khaimov, through Skillman Chemists, routinely billed plaintiffs for electric heating pads under Fee Schedule code E0215, reserved for "Electric heat pad, moist"

which is listed in the Fee Schedule as having a maximum permissible reimbursement amount of $20.93.

321.   Notwithstanding the foregoing, to the extent anything was dispensed at all, Khaimov, through Skillman Chemists, routinely billed Plaintiffs $74.20, or more than three times the maximum permissible reimbursement amount for DME billed under code E0215. Exhibit "18" in the accompanying Compendium of Exhibits is a representative sample of claims where Skillman Chemists submitted fraudulent bills for heating pads to Plaintiffs under code E0215.

322.   By billing for heating pads under code E0215 for $74.20, Khaimov, through Skillman Chemists, falsely represented the amount they were entitled to be reimbursed under the No-fault Law.

## DISCOVERY OF THE FRAUD

323.   To induce Plaintiffs to promptly reimburse their claims for the Topical Pain Creams, Topical Pain Patches, select NSAIDs or other medications, and DME and/or orthotic devices, Defendants have gone to great lengths to systematically conceal their fraud.  By way of example and not limitation:

- Khaimov, through Skillman Chemists, routinely and deliberately submitted facially valid claims for reimbursement that were based on a pre-determined protocol of treatment without regard for medical necessity;

- Khaimov, through Skillman Chemists, routinely and deliberately concealed that its No-fault claims were submitted pursuant to an unlawful referral, illicit kickback and/or other financial compensation arrangement between and among one or more of the Defendants and the No-fault Clinics in order to maximize reimbursement; and/or

- Khaimov, through Skillman Chemists, knowingly misrepresented and concealed that Skillman Chemists' claims for reimbursement were based on a pre-determined protocol of treatment without regard for medical necessity and were submitted pursuant to an unlawful referral, illicit kickback and/or other financial compensation arrangement between and among one or more of the Defendants and the No-fault Clinics in order to maximize reimbursement.

324.     Plaintiffs are under a statutory and contractual obligation to promptly and fairly process claims within 30 days. The documents submitted to Plaintiffs in support of the fraudulent claims at issue, combined with the material misrepresentations, omissions and acts of fraudulent concealment described above, were designed to, and did cause Plaintiffs to justifiably rely on them. As a proximate result, Plaintiffs have incurred damages of more than $167,000.00 based upon the fraudulent bill submissions.

325.     Based upon Defendants' material misrepresentations and other affirmative acts to conceal their fraud from Plaintiffs, Plaintiffs did not discover and should not have reasonably discovered the fraud until in or about June 2023.

## STATEMENT OF CLAIMS

### FIRST CLAIM FOR RELIEF

### AGAINST KHAIMOV, JOHN DOES 1 THROUGH 5, AND ABC CORPORATIONS 1 THROUGH 5

### (RICO, pursuant to 18 U.S.C § 1962(c))

326.     The allegations of paragraphs 1 through 325 are hereby repeated and re-alleged as though fully set forth herein.

### THE RICO ENTERPRISE

327.     From in or about 2021 through the filing of this Complaint, Defendant Khaimov and one or more of the John Does 1 through 5 and ABC Corporations 1 through 5 conducted and participated in the affairs of the Skillman Chemists enterprise through a pattern of racketeering activity, including the many acts of mail fraud described herein and in the representative list of predicate acts, annexed hereto, all of which are incorporated by reference. Defendant's conduct constitutes a violation of 18 U.S.C. § 1962(c).

328.     At all relevant times mentioned herein, Defendant Khaimov participated in the affairs of the Skillman Chemists enterprise through continuing a pattern of racketeering activities that consisted of creating, submitting and/or causing to be submitted fraudulent bills and supporting documents to Plaintiffs that were based, in part, on the dispensing of pharmaceutical products, including but not limited to Topical Pain Creams, Topical Pain Patches, and/or select other oral medications, such as NSAIDs and muscle relaxers, and medical supplies, including DME and orthotic devices (i) pursuant to an illegal kickback scheme and/or in exchange for other financial incentives; (ii) pursuant to a pre-determined protocol without regard for medical necessity; (iii) in violation of New York State laws regarding the legal operation of pharmacies and dispensing of pharmaceuticals; and/or (iv) were the product of illegal and/or invalid prescriptions issued pursuant to collusive agreements.

329.     One or more of the John Does 1 through 5 and one or more of the ABC Corporations 1 through 5 participated in the scheme by ensuring that the No-Fault Clinics provided the Skillman Chemists enterprise with a steady and ample supply of fraudulent prescriptions for medically unnecessary "pain relieving" pharmaceutical products, including Topical Pain Creams, Topical Pain Patches, and oral NSAIDS, muscle relaxants and other pain medications, and medical supplies, including DME and orthotic devices, based on illicit kickback and/or other financial compensation agreements between and among one or more of the Defendants and the No-fault Clinics or Clinic Controllers, as well as bogus documentation, that misrepresented necessity of the pharmaceutical products to facilitate the fraudulent billing alleged in the Complaint.  One or more of the ABC Corporations furnished documents that Defendant Khaimov required, in furtherance of the scheme to defraud, to obtain payment from Plaintiffs for fraudulent pharmaceutical claims.

330. It was both foreseeable and the intended consequence of the illicit kickback and/or other financial compensation agreements between and among one or more of the Defendants and the No-fault Clinics or Clinic Controllers, that the bogus documentation provided by one or more of the John Does 1 through 5, through one or more of the ABC Corporations 1 through 5, would be mailed to substantiate fraudulent claims and to induce payment from Plaintiffs.

### The Pattern of Racketeering Activity
### (Racketeering Acts)

331. The racketeering acts set forth herein were carried out on a continued basis for more than a two-year period, were related and similar, and were committed as part of the ongoing scheme of Khaimov, one or more of the John Does 1 through 5, and one or more of the ABC Corporations 1 through 5, to fraudulently bill pharmaceutical products, including but not limited to Topical Pain Creams and/or select oral medications, including NSAIDs and muscle relaxers, and medical supplies, including DME and orthotic devices, to defraud insurers and, if not stopped, will continue into the future.

332. This pattern of racketeering activity poses a specific threat of repetition extending indefinitely into the future, inasmuch as the Skillman Chemists enterprise continues to pursue collection on the fraudulent billing to the present day.

333. As a part of the pattern of racketeering activity, and for the purpose of executing the scheme and artifice to defraud as described above, Khaimov, with the knowledge and intent of one or more of the John Does 1 through 5 and one or more of the ABC Corporations 1 through 5, caused mailings to be made through the United States Postal Service, in violation of 18 U.S.C. § 1341. The mailings were made in furtherance of a scheme or artifice to defraud Plaintiffs and to induce them to issue checks to Skillman Chemists NY, Inc. based upon materially false and misleading information.

334.     Through the Skillman Chemists enterprise, Khaimov submitted fraudulent claim forms seeking payment for pharmaceutical products, including but not limited to Topical Pain Creams and other select oral medications, such as NSAIDs and muscle relaxers, and medical supplies, including DME and orthotic devices, that were dispensed (i) pursuant to an illegal kickback scheme and/or in exchange for other financial incentives; (ii) pursuant to a pre-determined protocol without regard for medical necessity; (iii) in violation of New York State laws regarding the legal operation of pharmacies and dispensing of pharmaceuticals; and/or (iv) pursuant to collusive agreements that were the product of illegal and/or invalid prescriptions.  The bills and supporting documents that were sent by and/or on behalf of Khaimov and/or others acting under his direction and control, as well as the payments that Plaintiffs made in response to those bills, were sent through the United States Postal Service. By virtue of those activities, Khaimov, one or more of the John Does 1 through 5, and one or more of the ABC Corporations 1 through 5 engaged in a continuous series of predicate acts of mail fraud.

335.     A sample list of predicate acts is annexed hereto which identifies the nature and date of mailings that were made by or on behalf of Khaimov in furtherance of the scheme as well as the specific misrepresentations identified for each of the mailings.

336.     Mail fraud constitutes racketeering activity as that term is defined in 18 U.S.C. § 1961(1)(b).

337.     Each submission of a fraudulent claim constitutes a pattern of racketeering activity within the meaning of 18 U.S.C. § 1961(5).

**Damages**

338.     By reason of the foregoing violation of 18 U.S.C. § 1962(c), Plaintiffs Allstate Insurance Company, Allstate Fire and Casualty Insurance Company, and Allstate Property and

Casualty Insurance Company have been injured in their business and property, in an amount in excess of $164,000.00, the exact amount to be determined at trial.

339.    Pursuant to 18 U.S.C. § 1964(c), Plaintiffs Allstate Insurance Company, Allstate Fire and Casualty Insurance Company, and Allstate Property and Casualty Insurance Company are entitled to recover from Khaimov, one or more of the John Does 1 through 5, and one or more of the ABC Corporations 1 through 5, three-fold damages sustained by it, together with the costs of this lawsuit and reasonable attorneys' fees.

**SECOND CLAIM FOR RELIEF**

**AGAINST SKILLMAN CHEMISTS AND KHAIMOV**

**(Common Law Fraud)**

340.    The allegations of paragraphs 1 through 325 are hereby repeated and re-alleged as though fully set forth herein.

341.    Defendants Skillman Chemists and Khaimov intentionally, knowingly, fraudulently, and with an intent to deceive Plaintiffs, made numerous false and misleading statements of material fact as to the necessity and price of the pharmaceutical products which they purportedly dispensed, thereby inducing Plaintiffs to make payments to Defendants that Defendants were not entitled to because of their fraudulent nature. As part of the fraudulent scheme implemented by Khaimov, Skillman Chemists made material misrepresentations and/or omitted material statements in submitting No-fault claims to Plaintiffs for payment.

342.    Defendants Skillman Chemists and Khaimov intentionally, knowingly, fraudulently, and with the intent to commit and facilitate billing fraud and deceive Plaintiffs, concealed the fact that the bills submitted to them for reimbursement of No-fault benefits for services relating to the dispensing of pharmaceutical products, including but not limited to the

90

Topical Pain Creams and select other oral medications, including NSAIDs and muscle relaxers, and medical supplies, including DME and orthotic devices, were misrepresented.

343.   Defendants Skillman Chemists and Khaimov intentionally, knowingly, fraudulently, and with the intent to commit and facilitate billing fraud and deceive Plaintiffs, concealed the fact that the pharmaceutical products which they purportedly dispensed, including but not limited to the Topical Pain Creams and select other oral medications, including NSAIDs and muscle relaxers, and medical supplies, including DME and orthotic devices, were dispensed (i) pursuant to an illegal kickback scheme and/or in exchange for other financial incentives; (ii) pursuant to a pre-determined protocol without regard for medical necessity; (iii) in violation of New York State laws regarding the legal operation of pharmacies and dispensing of pharmaceuticals; and/or (iv) as the product of illegal and/or invalid prescriptions issued pursuant to collusive agreements.

344.   Defendants Skillman Chemists and Khaimov intentionally, knowingly, fraudulently, and with the intent to commit and facilitate billing fraud and deceive Plaintiffs, concealed the fact that the services were provided pursuant to a protocol that was intended to maximize Defendants' profits and reimbursements of payments from Plaintiffs, as opposed to medical necessity.

345.   On information and belief, in connection with fraudulent No-fault claims for the Fraudulent Pharmaceuticals, Defendants Khaimov, through Skillman Chemists intentionally, knowingly, fraudulently, and with the intent to deceive, submitted, or caused to be submitted to Plaintiffs, patient medical records, assignments of benefits, prescriptions, reports, treatment verifications and/or bills for medical treatment which contained false representations of material facts, including but not limited to the following fraudulent material misrepresentations:

- False and misleading statements that Skillman Chemists was dispensing Topical Pain Creams, Topical Pain Patches and select oral medications, including NSAIDs and muscle relaxers, pursuant to legitimate New York State Prescriptions, when it was not;

- False and misleading statements that Skillman Chemists was billing Plaintiffs the maximum permissible charges under the No-fault Law for the Topical Pain Creams, Topical Pain Patches and select other oral medications, including NSAIDs and muscle relaxers, allegedly provided to Covered Persons, when it was not;

- False and misleading statements that Skillman Chemists was in conformance with core licensing requirements and entitled to receive No-fault benefits when in fact Defendants participated in collusive relationships with medical providers through which Defendant filled prescriptions pursuant to an illegal kickback and referral scheme for medically unnecessary pharmaceuticals;

- False and misleading statements as to why the Topical Pain Creams, Topical Pain Patches and select oral medications, including NSAIDs and muscle relaxers, were medically necessary; and

- False and misleading statements regarding the availability of over-the-counter, FDA approved medications in lieu of Topical Pain Creams, Topical Pain Patches and select oral medications that were purportedly provided by Defendants as part of a predetermined protocol of treatment.

346.    In connection with fraudulent No-fault claims for DME and orthotic devices, Defendants Khaimov and Skillman intentionally, knowingly, fraudulently and with an intent to deceive, submitted bills, prescriptions, and other documentation that contained false representations of material facts, including, but not limited to, the following fraudulent material misrepresentations and/or omissions of fact:

- False and misleading statements as to the nature, quality, and cost of the DME and/or orthotic devices purportedly supplied to Covered Persons;

- False and misleading statements as to the amounts Skillman Chemists was entitled to be reimbursed under the No-fault Law;

- With respect to Fee Schedule items, false and misleading statements in the bills and supporting documentation submitted to Plaintiffs that the DME

and/or orthotic devices allegedly supplied were in fact the items supplied to the Covered Persons;

- With respect to Non-Fee Schedule items, false and misleading statements in the bills and supporting documentation submitted to Plaintiffs misrepresenting that the charges for the DME and/or orthotic devices did not exceed the lesser of the actual wholesale cost of the medical equipment to the provider, plus 50%; or the usual and customary price charged to the public;

- False and misleading prescriptions for the DME and/or orthotic devices purportedly supplied to Covered Persons, generically describing the item to conceal the type of item being prescribed; and/or

- False and misleading prescriptions for DME and/or orthotic devices, concealing the fact that the (a) DME and/or orthotic devices were prescribed and supplied pursuant to a pre-determined, fraudulent protocol whereby, Defendant Khaimov, through Skillman, paid kickbacks to No-fault Clinics to induce the No-fault Clinics to direct their associated physicians and chiropractors to prescribe large amounts of substantially similar, medically unnecessary DME and/or orthotic devices; (b) DME and/or orthotic devices were not covered by the applicable Fee Schedule; and (c) DME and/or orthotic devices were generically described on the prescriptions, all of which was designed to permit Defendant Khaimov, through Skillman, to manipulate the payment formulas and their claims submissions in order to maximize the charges that they could submit to Plaintiffs and other insurers.

347. In numerous instances, the medical records, reports, prescriptions, and bills submitted, or caused to be submitted, by Defendants Khaimov, through Skillman Chemists to Plaintiffs in connection with Defendants' requests for reimbursement contained false representations which were intended not only to defraud Plaintiffs but constituted a grave and serious danger to the Covered Persons and the consumer public.

348. The foregoing was intended to deceive and mislead Plaintiffs into believing that Khaimov, through Skillman Chemists, was providing medically necessary Topical Pain Creams, Topical Pain Patches, other select oral medications, including NSAIDs and muscle relaxers, DME and orthotic devices, when, in fact, they were not.

349.     Defendants Skillman Chemists and Khaimov knew the foregoing material misrepresentations to be false when made and nevertheless made these false representations with the intention and purpose of inducing Plaintiffs to rely thereon.

350.     Plaintiffs did in fact reasonably and justifiably rely on the foregoing material misrepresentations, which they were led to believe as a result of Defendants' acts of fraud and deception.

351.     Had Plaintiffs known of the fraudulent content of, and misrepresentations within the documentation and bills, submitted to them, Plaintiffs would not have paid Skillman Chemists for claims for No-fault insurance benefits submitted in connection therewith.

352.     Furthermore, Defendants Skillman Chemists and Khaimov's far-reaching pattern of fraudulent conduct evinces a high degree of moral turpitude and wanton dishonesty which, as alleged above, has harmed, and will continue to harm, the public at large, thus entitling Plaintiffs to recovery of exemplary and punitive damages.

353.     By reason of the foregoing, Plaintiffs have sustained compensatory damages and been injured in their business and property in an amount in excess of $167,000.00, the exact amount to be determined at trial, plus interest, costs, punitive damages, and other relief the Court deems just.

## THIRD CLAIM FOR RELIEF

## AGAINST DEFENDANTS SKILLMAN CHEMISTS AND KHAIMOV

### (Unjust Enrichment)

354.     The allegations of paragraphs 1 through 325 are hereby repeated and re-alleged as though fully set forth herein.

355.     By reason of their wrongdoing, Defendants Skillman Chemists and Khaimov have been unjustly enriched, in that they have, directly and/or indirectly, received monies from Plaintiffs that are the result of unlawful conduct and that, in equity and good conscience, they should not be permitted to keep.

356.     Plaintiffs are therefore entitled to restitution from Defendants Skillman Chemists and Khaimov in the amount by which they have been unjustly enriched.

357.     By reason of the foregoing, Plaintiffs have sustained compensatory damages and been injured in their business and property in an amount in excess of $167,000.00, the exact amount to be determined at trial, plus interest, costs, and other relief the Court deems just.

**FOURTH CLAIM FOR RELIEF**

**<u>AGAINST SKILLMAN CHEMISTS</u>**

**(Declaratory Judgment under 28 U.S.C. § 2201)**

358.     The allegations of paragraphs 1 through 325 are hereby repeated and re-alleged as though fully set forth herein.

359.     At all relevant times mentioned herein, each and every bill mailed by Khaimov, through Skillman Chemists, to Plaintiffs, sought reimbursement for medically unnecessary "pain relieving" pharmaceutical products, including Topical Pain Creams, Topical Pain Patches and a limited variety of other oral medications, and medical supplies, including DME and orthotic devices.

360.     At all times relevant herein, Defendants Skillman Chemists and Khaimov exploited the No-fault Law through the utilization of various deceptive billing tactics engineered to maximize the amount of reimbursement from insurers, in general, and Plaintiffs, in particular,

through the submission of fraudulent billing pursuant to an unlawful kickback/referral arrangement.

361.    At all relevant times mentioned herein, each and every bill mailed by Skillman Chemists to Plaintiffs sought reimbursement for Topical Pain Creams, Topical Pain Patches and/or select other oral medications, including NSAIDs and muscle relaxers, DME and orthotic devices, that were dispensed: (i) pursuant to an illegal kickback scheme and/or in exchange for other financial incentives; (ii) pursuant to a pre-determined protocol without regard for medical necessity; (iii) in violation of New York State laws regarding the legal operation of pharmacies and dispensing of pharmaceuticals; and/or (iv) pursuant to collusive agreements and the product of illegal and/or invalid prescriptions.

362.    At all relevant times mentioned herein, each and every bill mailed by Khaimov through Skillman Chemists, to Plaintiffs for DME and/or orthotic devices sought reimbursement in excess of the amounts authorized by the No-fault Law and applicable Fee Schedule by materially misrepresenting the DME and/or orthotic devices provided, if provided at all, as well as the cost and quality of the billed for DME and/or orthotic devices.

363.    To the extent the billed for DME and/or orthotic devices were provided at all, each item was a basic, low-quality piece of medical equipment for which Skillman Chemists' wholesale cost was a mere fraction of the amount they charged Plaintiffs and/or was medically unnecessary because it was provided pursuant to a predetermined course of treatment, irrespective of medical need.

364.    At all times relevant herein, the Defendants exploited the No-fault Law and applicable Fee Schedule through the utilization of various deceptive billing tactics engineered to maximize the amount of reimbursement from insurers, in general, and Plaintiffs, in particular,

through the submission of fraudulent billing documents that misrepresented the nature, quality and cost of DME and orthotic devices that both are and are not listed on the relevant fee schedule purportedly provided to Covered Persons.

365.     Because Skillman Chemists engaged in the conduct alleged herein, Plaintiffs seek a declaration that they are not required to pay any of Skillman Chemists' claims for Topical Pain Creams, Topical Pain Patches, and/or select oral medications, including NSAIDs and muscle relaxants, and medical supplies, including DME and orthotic devices, which were dispensed pursuant to the schemes to defraud alleged herein.

366.     As the Defendants have knowingly made the foregoing false and fraudulent misrepresentations about the pharmaceuticals and medical supplies purportedly provided to Covered Persons and the amounts they were entitled to be reimbursed, it is respectfully requested that this Court issue an order declaring that Skillman Chemists is not entitled to receive payment on any pending, previously-denied and/or submitted unpaid claims and Plaintiffs, therefore, are under no obligation to pay any of Skillman Chemists' No-fault claims.

367.     The Defendants will continue to seek reimbursement from Plaintiffs for their false and fraudulent claims absent a declaration by this Court that Plaintiffs have no obligation to pay the pending, previously denied and/or submitted unpaid claims, regardless of whether such unpaid claims were ever denied, regardless of the purported dates of service.

368.     Plaintiffs have no adequate remedy at law.

## **JURY DEMAND**

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs demand a trial by jury.

**WHEREFORE,** Plaintiffs demand judgment as follows:

i)       Compensatory damages, in an amount in excess of $167,000.00, the exact amount

to be determined at trial, together with prejudgment interest;

       ii)      Punitive damages in such amount as the Court deems just;

       iii)     Treble damages, costs, and reasonable attorneys' fees on the First Claim for Relief, together with prejudgment interest;

       iv)    Compensatory and punitive damages on the Second Claim for Relief, together with prejudgment interest;

       v)      Compensatory damages on the Third Claim for Relief, together with prejudgment interest;

       vi)     Declaratory relief on the Fourth Claim for Relief declaring that Plaintiffs have no obligation to pay any of Defendant Skillman Chemists' unpaid claims, whether pending, previously denied and/or submitted, regardless of whether such unpaid claims were ever denied, and regardless of the purported dates of service; and

       vii)    Costs, reasonable attorneys' fees and such other relief that the Court deems just and proper.

Dated:  New York, New York,
            September 19, 2024


                                        MANNING & KASS, ELLROD, RAMIREZ,
                                            TRESTER LLP


                                        By:   /s/ Lee Pinzow                              .
                                            Robert A. Stern
                                            James A. McKenney
                                            Kristy R. Eagan
                                            Lee Pinzow

                                            100 Wall Street, Ste 700
                                            New York, New York 10005
                                            (212) 858-7769

                                            *Attorneys for Plaintiffs Allstate Insurance
                                            Company, Allstate Fire and Casualty
                                            Insurance Company, Allstate Indemnity
                                            Company, and Allstate Property and
                                            Casualty Insurance Company*

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| ALLSTATE INSURANCE COMPANY, ALLSTATE FIRE AND CASUALTY INSURANCE COMPANY, ALLSTATE INDEMNITY COMPANY, AND ALLSTATE PROPERTY AND CASUALTY INSURANCE COMPANY, <br><br> Plaintiffs, <br><br> -against- <br><br> SKILLMAN CHEMISTS CORP., VYACHESLAV KHAIMOV, JOHN DOES 1 THROUGH 5, AND ABC CORPORATIONS 1 THROUGH 5, <br><br> Defendants. | CIVIL ACTION <br><br> 24-CV-6619 <br><br> COMPLAINT <br><br> (JURY TRIAL DEMANDED) |

# COMPLAINT

MANNING & KASS, ELLROD, RAMIREZ, TRESTER LLP
ATTORNEYS FOR PLAINTIFFS
100 WALL STREET, SUITE 700
NEW YORK, NEW YORK 10005
TELEPHONE: (212) 858-7769